**NORTH TEXAS PRODUCERS ASSOCIA-TION, Appellant,**

v.

**C. E. STRINGER et ux., Appellees.**

No. 16209.

Court of Civil Appeals of Texas.

Fort Worth.

April 21, 1961.

Rehearing Denied May 19, 1961.

Moore. & Lipscomb and Hardy Moore, Paris, for appellant.

Woodrow H. Edwards, Mt. Vernon,. Howard S. Smith, Sulphur Springs, for appellees.

MASSEY, Chief Justice.

This is an action for wrongful death growing out of a fatal automobile-truck collision, authorized by Vernon's Ann.Tex. Civ.St. Title 77, "Injuries Resulting In. Death", Art. 4671, "Cause of action" et seq.

Appellant North Texas Producers Association was defendant in the trial court in the suit brought by C. E. Stringer et ux. for damages sustained as the result of the death of their son Jerry Stringer, hereinafter termed as the deceased. One of said deceased's companions was also killed, and the other has no recollection of the events of the evening after entering the automobile of the deceased.

The jury found defendant-appellant and its truck driver negligent as charged, acquitted the deceased of contributory negligence by failure and/or refusal to return any affirmative answers to the issues submitting inquiry thereof, and found that the collision resulting in death was not the result of an unavoidable accident. The jury furthermore found that the amount of $36,082 "paid now in cash" would reasonably and fairly compensate the parents of the deceased for his death. Judgment was entered upon the verdict so returned, but upon hearing the motion for new trial the court required a remittitur which reduced damages to the sum of $18,000. It is to be noticed that the parties stipulated reasonable and necessary medical, hospital, funeral and burial expenses in the amount of $1,082.60, for which suit was also brought, consideration whereof reduces the amount for which future damages were awarded because of wrongful death to $16,917.40.

Judgment affirmed.

The fatal collision occurred on a clear,. dry and cold night at shortly after 10:00 o'clock P.M., December 5, 1958, on Texas State Highway No. 11 between the mu-

nicipalities of Sulphur Springs and Winnsboro. The deceased, along with two companions, was driving in an easterly direction toward Winnsboro after having attended a show in Sulphur Springs. The fatal collision occurred approximately six miles east of Sulphur Springs. The condition of the roadway upon the occasion in question is of considerable importance. It, or the section where the collision occurred, was under construction in that it was being prepared for resurfacing with new paving of an asphalt type. The process being used was to place new gravel over the main traveled portion of the road, and extending to either side thereof onto each shoulder, with this material graded, watered, packed and rolled and in proper position for finishing by applying the new asphalt coating. Everything had been done save and except for the application of the new coating, the appearance of the road being that of a freshly graded graveled road. The apparent graveled and main traveled road surface, under the conditions obtaining, was 42 feet in width, with no character of "center-marker" whereby one could readily fix the middle of the highway. There were warning signs at the point where the deceased and his companions entered the portion of the road under construction, and a posted speed limit thereon of 45 miles per hour.

Appellant's truck was a tractor pulling semi-trailer. The trailer was of tank-type oval construction holding approximately 2,800 gallons, used for the transport of milk. It was surrounded by a heavy steel frame or skirt. The truck and trailer combined weighed approximately 20,000 lbs., as compared with the approximate 3,200 lbs. of the automobile driven by the deceased. The tank-trailer was approximately 25 or 26 feet in length, and the truck and trailer combined measured approximately 33 or 34 feet in length. Immediately prior to the time of the collision the driver thereof, acting in the scope and course of his employment for the appellant, was driving in a westerly direction on

Highway No. 11 on a regular milk-route. He was stopping at the dairy barns where members of the appellant organization had left raw milk in receptacles. Prior to the time of the collision he had picked up and placed approximately 3,200 lbs. of milk in his tank. Just prior to the time of the collision he intended to pick up more milk at what is known as the Kight Dairy barn, which barn is located on the south side of the highway. The means whereby he intended to place his tank-trailer in position to take the milk from the Kight barn involved driving past the point on the highway where the barn fronted, then to back up the truck, throwing the trailer into a position known as a partial "jack-knife", so that the rear thereof would move into close proximity with the barn after the trailer wheels passed over a culvert into the barn driveway.

As he approached the point where he stopped, appellant's truck driver pulled across the center of the road and came to a stop with the entire truck and trailer on the left-hand, to him, side of the 42 feet of roadway. He had his headlights burning on "low-beam", and he had the directional lights on the front of his truck flashing as though it was the intention of the driver thereof to make a left turn. He started backing up, turning his wheels so as to make the rear of his trailer work toward the south across the culvert toward the front of the barn (which physically necessitated angling the rear part of the tractor toward the north), when he noticed the reflection of lights from the deceased's automobile on the side of the barn. He immediately stopped, his position at that time being such that the right-hand side of his tractor was near the center of the roadway, but his attached trailer was angled cross the south half thereof. He maintained this position in the hope and belief that the deceased would discover him and turn across to the left and pass him by the use of the north one-half of the road. He saw the headlights of the oncoming automobile. He estimated the

speed of said vehicle to be 75 miles per hour. In his testimony he stated that he observed the same for "just a very few seconds" before the collision. Upon further query he stated that "I don't guess it was more than eight or ten seconds". He did not testify in estimation of how distant was the deceased's automobile when he first observed its headlights. The automobile traveled straight ahead, not slackening its speed until just immediately prior to the collision, passing by the left side of the tractor and into the side of the trailer. The front end of the automobile passed under the rail around the tank-trailer, and struck into the trailer wheels at the point between those on the left and those on the right side thereof. The left front post on the driver's side of the deceased's automobile struck and broke against the rail around the trailer. The automobile stopped immediately. There was testimony that the force of the collision did not move the truck or trailer. The vehicles were "locked together", so that it required a cable and truck to pull the automobile out from under the trailer. The deceased died several hours afterward without having regained consciousness.

■ One reasonable theory as to what occurred was that the deceased approached the appellant's truck in the belief that it was stopped awaiting his passage so that the driver could complete the left turn the directional lights on the front of the truck were indicating as soon as the automobile passed by. In view of the condition of the roadway it was not necessarily apparent that the truck was on the deceased's right-hand one-half thereof. Neither was it necessarily apparent that the "running-lights" on the side of the trailer were observable and interpretable as indicating that the trailer was angled across and blocking the deceased's right-hand side of the road. Since the jury found that the deceased was driving at a speed of 45 miles per hour it is obvious that it did not believe the estimate of speed given by appellant's driver. Indeed, if the driver ob-

served the automobile for a period of eight seconds at 75 miles per hour he observed it cover a distance of approximately 882 feet, and if he observed it for a period of ten seconds at such speed he saw it cover a distance of approximately 1,102 feet. Yet he did not turn to observe it until he discovered the fact of its approach by the flashing of its lights upon the side of the Kight barn. In view of this, and other reasons, including the interest of appellant's driver, the jury was entitled to disregard his testimony. Other evidence given relative to excessive speed on the part of the automobile of the deceased was from an expert witness based upon physical facts and hypothetical questions. Such evidence amounted to opinion testimony. The ultimate decision upon the proper conclusion to be drawn from the evidence was the peculiar province of the jury. That the jury differed with the expert would be no reason to question the verdict.

Appellant's first and second points present the contention that the deceased was contributorily negligent as a matter of law and that in any event the failure on the part of the jury to find the deceased guilty of contributory negligence in the answer to one or more of the special issues thereupon submitted was against the greater weight and preponderance of the evidence.

We have heretofore described the events and happenings leading up to and culminating in the collision, as result of which the deceased met his death, presenting same in the light most favorable to appellees, yet without disregard of the rule which denies a right to base a finding or conclusion to the contrary of evidence shown in the record, even when the circumstances entitled the jury to disbelieve testimony presented to it. The failure on the part of the jury to find contributory negligence would be synonymous to any ordinary negligence case in which the defendant was acquitted of fault, and where the plaintiff who lost the case complained thereof on appeal on the theory that such verdict was against the great weight and preponderance of

the evidence. Plaintiff's burden in such a case hypothesized would be to prove his case by a *preponderance of the evidence* and to prevail upon the jury to make findings which establish that he had done so. Should the jury in such a case refuse to find, in accordance with the plaintiff's theory of liability, that the defendant was negligent as charged, the plaintiff could not prevail unless he could demonstrate that the record established the defendant's negligence as a matter of law. His ground of complaint therefore is not properly one to be premised upon the jury's action (or non-action) amounting to a finding against the great weight and preponderance of the evidence, because of which he is entitled to another trial. The same thing would be true when the contention is based upon the jury's failure or refusal to find contributory negligence which amounted to a proximate cause of the injuries and damages sustained by plaintiff and by reason of which, in view of the jury's findings against the defendant on plaintiff's primary complaint, he would be entitled to a judgment for damages. That, as we view it, is the condition of the appellant in this case, i. e., he must demonstrate that the decedent was guilty of negligence, as a matter of law, which was the proximate cause of the collision. If the appellant has not done so the judgment entered against him should not be disturbed, at least on such ground.

Basically, it seems to us, appellant's theory is that the deceased was guilty of failing to drive slowly enough to stop within the range of his vision, which range of vision appellant assumes must have disclosed to the deceased the situation before him created by the appellant's truck and semi-trailer obstructing his right-hand one-half of the traveled portion of the roadway. Ergo, says appellant, the deceased would or should have slowed the speed of his automobile so as to stop the same, or in any event would or should have turned to the left, in the avoidance of the collision, except that his speed was so excessive that

time would not exist within which the deceased could stop or turn aside.

Such seems to be known as the South Dakota rule, which is followed in many states. It is also called the range of vision rule or doctrine, requiring speeds enabling a complete stop within the assured clear distance ahead regardless of conditions limiting the range of vision. This doctrine or rule has been rejected by this very court. Lone Star Gas Co. v. Fouche, Tex. Civ.App., Fort Worth 1945, 190 S.W.2d 501, writ ref. w. o. m., holding that the issue of contributory negligence on the part of the driver failing to stop and avoid a collision is usually one for the jury to determine. See also Pope v. Clary, Tex. Civ.App., Fort Worth 1942, 161 S.W.2d 828, writ ref. w. o. m.

In another case this court had occasion to examine the law in a similar respect and reached the conclusion that where the evidence does not demonstrate that the driver who failed to stop was proceeding along the roadway immediately prior thereto with an entire want of care, the matter of whether or not he exercised that degree of care that an ordinarily prudent person would have exercised under the same or similar circumstances would be a question of fact for the jury. Hipfner v. Anderson, Tex.Civ.App., Forth Worth 1953, 258 S.W. 2d 357, writ ref. n. r. e. See also Dudley v. Carlson, Tex.Civ.App., Austin 1954, 273 S.W.2d 918, writ ref. n. r. e.; 28 Tex.Law Review 120.

 It is to be remembered that in the instant case the deceased cannot be heard, for his lips are sealed in death. In such instances the presumption is that the deceased exercised ordinary care for his own safety. In order for the appellant to be entitled to have it ruled that as a matter of law he failed to do so, the burden rested upon it to overcome the presumption by competent evidence so conclusively that reasonable minds could not differ with re-·spect thereto. In this case there is not the

slightest suggestion that the deceased was bent on self-destruction. There obtains the strongest of presumptions that he was not. In general it may safely be said that persons in ordinary travel are often called upon to estimate the speed of vehicles approaching or apparently approaching upon the highway, or to estimate distances intervening between the vehicle being driven and that being approached. Mistakes with reference thereto frequently occur, particularly at night. Such mistakes of judgment fall far short of establishing want of ordinary care. Boaz v. White's Auto Stores, 1943, 141 Tex. 366, 172 S.W.2d 481. Additionally, in the instant case we have the matter of the appellant's truck having its turn-indicators flashing the apparent signal that it was about to make a left-hand turn across the deceased's one-half of the roadway at a point where there was no clear marker (as by a center-stripe) where the boundary of deceased's right-hand one-half of the roadway was located.

The point, or points, of error is and are overruled.

Appellant advances the contention that the amount of damages originally found by the jury, in the amount of $36,082, was flagrantly excessive and manifestly unjust, thus demonstrating that the jury in arriving at its whole verdict was prejudiced and unfair, wherefore the entire verdict and judgment should be set aside and a new trial granted. In other words it may properly be said that appellant claims that when we disregard the fact that the trial court required a remittitur in this case which would reduce the amount of the damages awarded to the maximum figure the court believed would be supported by the evidence, the single fact that the jury found damages in the amount of approximately double the judgment finally decreed, unaided by any extraneous evidence such as by proof of misconduct in arriving at the answer to the issue of damages, etc., establishes prejudicial and reversible error in this case.

The point of error is overruled. It would be a rare case where by reference to the amount of damages found by the jury in its answer to a special issue it may be properly said that the amount so found in and of itself demonstrated that the jury was moved to answer the issues on liability in disregard of the instructions of the court and/or in violation of that duty imposed upon it under the decisions of law. This is not such a case. Even if we assume that the natural sympathies of the human beings chosen to sit as a jury cause them to be unreasonably generous in the awarding of damages to a bereaved father and mother because of the wrongful death of their dutiful son, in a mistaken zeal for right, or even prejudice against a wrongful act of the defendant proven in the evidence, such would not establish the inseparability of such erroneous or even wrongful action on the part of the jury from its action upon the issues of liability. The presumption would be that the wrong in the respect to the issue on damages was separable from the action taken in arriving at the answers to the issues on liability. In view of the provisions of Texas Rules of Civil Procedure, rule 327 we believe that the burden of overcoming such presumption would be obligatory upon the appellant if it would establish reversible error. This burden has not been discharged by the appellant. See also the discussion in case of World Oil Co. v. Hicks, 1937, 129 Tex. 297, 103 S.W.2d 962; McDonald, Texas Civil Practice, p. 1476, et seq.; "New Trial", sec. 18.22, "-C. Remittitur."

The trial court deleted from the definition of proximate cause the common wording and definition of "new and independent cause", and denied the request of the appellant for the inclusion in the charge of a definition of the term and insertion thereof in the body of the court's definition of proximate cause. Under the theory that the presence and location of the Kight dairy barn played a part in the causation of the collision, appellant insists that it

was entitled to have its request granted and that prejudicial reversible error resulted because of the court's denial.

■■■ A trial court should not incorporate the element of "new and independent cause" into the definition of proximate cause given in the charge unless it is in the case under the evidence, although it would be a rare case indeed where reversible error would flow from an unnecessary inclusion thereof. On the other hand it is settled that reversible error occurs when the question of "new and independent cause" is in the case and the court erroneously fails to include it in the charge to the jury. Appellant cites those accident cases wherein particular locations of movable vehicles or property have been held to raise the issue of new and independent cause and to require that the definition of proximate cause contain the element of new and independent cause. None of these relate to fixed permanent improvements on private property adjoining the roadways where the collisions took place. We fail to see where the location of the Kight Dairy barn could be considered as even a remote cause of the collision in the instant case. Even if it could be so considered it could not be made the basis of a contention such as is presented under the point of error. A prior and remote cause cannot be made the basis for an action for damages if it did nothing more than furnish the condition or give rise to the occasion by which the injury was made possible if the injury is the result of some other cause which reasonable minds would not have anticipated, even though the injuries would not have happened but for such condition. The danger or apparent danger must exist in the condition itself. Panhandle & S. F. Ry. Co. v. Sledge, Tex.Civ. App., Amarillo 1930, 31 S.W.2d 146, affirmed Tex.Com.App., 45 S.W.2d 1112. A cause of the type which under no conceivable circumstance could be made the basis of an action for the damages which resulted therefrom could not amount to a new and independent cause nor entitle a litigant to insist that the element of new and independent cause be inserted into the court's definition of proximate cause.

■■■ Appellant complains that the trial court erred in failing to instruct the jury that in arriving at its answer to the issue on damages that the present value of the deceased's future anticipated contributions to his parents (plaintiffs-appellees) should be discounted by the amount which, presently awarded, would during the period of time covered by the award represent the earning power of money safely invested. The issue given by the court read: "What sum of money, if any, * * * if paid now in cash, would reasonably and fairly compensate the plaintiffs C. E. Stringer and Nell Rose Stringer for the death of their son, Jerry Stringer?" There were appended instructions of the usual elements of damages found in similar charges. Appellant's requested instruction obviously draws upon language to be found in charges submitted in cases falling under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. It is to be noted that neither litigant in the instant case offered any proof upon the matter of present value of money to be paid in the future. In the trial of prior similar cases the charges submitted upon the question of damages have been identical, or nearly identical, to that submitted to the jury by the trial court. No case has been reversed on the theory advanced in this instance by the appellant. The point of error is overruled.

■■■ By another point of error complaint is made of the closing argument to the jury. Objection was made and was overruled. Jesse R. Reed was the State Highway Patrolman who investigated the collision in question. He arrived at the scene shortly after it occurred. He was tendered as a witness by the appellant, and testified as to the length of a single skid-mark or "track" leading up to the point where one of the tires on the automobile of the deceased came to rest. He was not asked by either party upon trial his opinion

as to the speed of the automobile immediately prior to time of the collision. Counsel, after discussing with the jury the testimony upon speed given by appellant's truck driver, and its expert collision analyst, stated: "Did they ask Jessie Reed, this Highway Patrolman whom they compliment so highly, how fast he was driving. Now Members of this Jury, it was their responsibility * * *." Here objection was made by counsel for appellant, who stated, "Your Honor, Mr. Smith knows that was not competent evidence. Mr. Reed, not being an expert, could not have testified as to his opinion as to the rate of speed." The objection was overruled, and the argument continued, as follows: "He asked the Sheriff, yet he says here in his objection that it was improper to have asked the Highway Patrolman. Is that being fair to you? Is it? They didn't ask Jesse Reed how fast in his opinion this boy was traveling. It was their responsibility, Members of this Jury, to show that this boy was driving * * *." Here objection was made and · overruled upon the ground that the argument was an invitation to the jury to assume the Patrolman's testimony would have been unfavorable to the appellant.

In a case of certain analogy it has been held that under the circumstances presented no juror of ordinary intelligence could have been persuaded by the argument to agree to a verdict contrary to that to which he would have agreed but for such argument, it not being of the type characterized generally as prejudicial and inflammatory and not having introduced into the case any new evidence of a material nature. T.R. C.P. 434; Goforth v. Alvey, 1954, 153 Tex. 449, 271 S.W.2d 404. The point of error is overruled.

█ Appellant's final point of error is that the damages, even after they were reduced to the amount of $18,000 by the remittitur required by the trial court, were nevertheless excessive in that there was no testimony that the deceased's net earnings prior to the time he reached the age of 21

years would have amounted to the $5,000 alleged nor that after having reached the age of 21, had deceased lived, he would. have made any contribution to his parents. It appears that $1,082.60 in expenses was stipulated by the parties as reasonable and necessary. Therefore the award of damages for wrongful death would be $16,917.-40.

The only testimony relating to the matter of damages was by the parents of the deceased. At the time of his death the deceased lacked 25 days of reaching age 17. The father was 43 years of age and the mother 38 years of age. The only other child of these parents was a boy some 4 years of age. The deceased did odd jobs for others than his parents in his home town, and had also secured a job at an automobile service station working after school hours and making from $10 to $22 per week, depending upon the hours he was called upon to work. He was allowed to keep the money he earned. He bought his own clothes, the gasoline for the family automobile when he used it, and often contributed to his family. He helped his mother in the home, performed chores around the premises, mowing the lawn, etc., and generally making himself useful. He was a junior in high school at the time of his death, an average student or better, and was healthy and athletically inclined. In brief, it appears that the deceased was the average normal youth of his age, as to whom the same questions exist in making any prognostication into the future. Such circumstances present unusual difficulty in assessing damages arising as the result of wrongful death. Human experience on the part of the court or jury charged with arriving at a proper amount as damages must necessarily serve in such a case, and our law knows of no better substitute.

In 1954 an award of $25,000 for the death of a 12 year old boy was reduced to $16,000. Texas & N. O. R. Co. v. Hanson, Tex.Civ.App., Galveston 1954, 271 S.W.2d 309, writ dism. The father was 52 years of age, the mother 42. In 1950 a judgment

for damages for wrongful death of a 14 year old boy in the amount of $15,208 was affirmed. J. Weingarten, Inc. v. Sanchez, Tex.Civ.App., Galveston 1950, 228 S.W.2d 303. Evidence showed the boy capable of earning $5 per day when employed by neighbors. The boy's father was a crippled person 55 years of age, and the mother's age was 46. In either case the proof showed little more than that the deceased child was average and normal. Such evidence in our opinion entitled the finder of fact in arriving at an amount in damages because of wrongful death to consider what contributions would reasonably and probably have been made by the deceased, except for the fact of death, in the light of human experience and knowledge about the norm of youthful growth, development potential, and fidelity to parents. It is true that in this character of case a sympathetic jury is sometimes inclined to become over-liberal in its allowance of damages, presenting a not-unusual circumstance requiring the courts to exercise the authority of requiring a remittitur which would bring the ultimate recovery within the range of some substantial uniformity. The act of the trial court in requiring that remititur which reduced the total of damages in this case to the amount of $18,000 was a proper exercise of such authority. When we consider the fact that we have had a progressive devaluation of the dollar between the years 1950 and 1960, it becomes apparent that the amount of $16,917.40 in wrongful death damages was, in view of the evidence, eminently reasonable and fair. The point of error is overruled.

American Law Reports, Annotated, has conducted research into the matter of such character of damages. The student is directed to 14 A.L.R.2d 485, Annotation, "Measure and elements of damages for personal injury resulting in death of infant", and to page 550, Annotation, "Excessiveness and inadequacy of damages for personal injury resulting in death of infant".

Judgment is affirmed.