Mrs. Joe B. GALVAN, et al.,
Appellants,

v.

Dr. Larry L. FEDDER, et al.,
Appellees.

No. A14-82-603CV.

Court of Appeals of Texas,
Houston (14th Dist.).

July 12, 1984.

Russell H. McMains, Edwards & Perry, Corpus Christi, L.L. Knutson, Law Offices of O.L. Knutson, Kyle, Clem Lyons, Southers & Lyons, San Antonio, for appellants.

William H. Payne, Fulbright & Jaworski, Dan Ryan, Ryan & Marshall, Houston, for appellees.

Before J. CURTISS BROWN, C.J., and DRAUGHN and ELLIS, JJ.

## OPINION

J. CURTISS BROWN, Chief Justice.

This is an appeal from a take-nothing judgment rendered in a medical malpractice, wrongful death, and survival action instituted by appellants. Upon submission of special issues, the jury found Dr. Larry Fedder negligent in his treatment of the deceased, Joe Galvan. However, it failed to find such negligence a proximate cause of Galvan's death, and answered zero to the damage issues. In ten points of error, appellant complains of the trial court's findings as to Dr. Fedder. We reverse and remand.

Joe Galvan was referred to Dr. Larry Fedder, an internal medicine specialist, for evaluation and treatment of a possible diabetic condition. After examining him on March 8, 1978, Dr. Fedder concluded that Galvan was mildly afflicted with Type II diabetes mellitis. Dr. Fedder began Galvan's treatment with an oral hypoglycemic agent, Diabinese, prescribing two 250 milligram tablets twice daily, or 1000 milligrams per day. The recommended dosage set out in the drug's package insert and in the Physicians Desk Reference Manual (or P.D.R.) was 250 milligrams. The manufacturer warned that an initial large dose, known as a loading or priming dose, should not be used, nor should the maximum dosage exceed 750 milligrams per day.

Joe Galvan first began having problems on March 17, 1978, when he developed fever, a severe rash, and muscle soreness. Later that same day, Mrs. Galvan telephoned Dr. Fedder's office and reported the symptoms. His nurse spoke to Mrs. Galvan. Mr. Galvan was told to stop taking the aspirin he had begun using for his fever and muscle soreness. By that evening, Joe Galvan had a 101 degree fever. On March 18, the fever, rash, and muscle soreness had worsened. Mrs. Galvan took her husband to the doctor's office. He was seen by Dr. Fedder's partner, Dr. John Montgomery, who concluded that Joe Galvan was suffering from either a drug eruption or the measles. He ordered termination of all medication. On March 19, Galvan developed diarrhea and nausea in addition to his fever and rash. On March 20, Joe Galvan saw Dr. Fedder and complained of nausea, general malaise, weakness, high fever, and diarrhea. After determining that his white blood count was normal, Dr.

Fedder prescribed Donnagel and paragoric for Galvan's symptoms. On March 21, Dr. Montgomery prescribed Lomotil for treatment of Galvan's diarrhea. On March 22, Galvan's condition had not improved, so he was admitted to Park Plaza Hospital. Shortly thereafter, he was seen by Dr. Matthew Monroe, an internal medicine specialist, and Dr. Al Hernandez, a gastroenterologist. Dr. Monroe performed a rectal examination which was strongly positive for blood. While there was some disagreement as to its specific nature, it was determined that Galvan suffered from an acute inflammatory bowel disease. Galvan's initial hospitalization lasted until April 27, 1978, during which time Dr. Edward Earle performed surgery on him. The surgery consisted of an exploratory laparotomy with an appendectomy, together with a proctocolectomy and a cholecystectomy. On May 1, 1978, appellant was readmitted to Park Plaza. He died on June 12, 1978. The immediate cause of death was diagnosed as a thrombosis, or blood clot, due to kidney failure, due to multiple abdominal and lung abcesses, stemming from Galvan's "acute inflammatory bowel disease," and resultant complications from the surgeries.

In point of error four, appellants contend the jury's failure to find that Dr. Fedder's negligent treatment of Galvan was a proximate cause of his death is against the great weight and preponderance of the evidence. In point of error five, appellants argue that there was no evidence to support the submission of a definition of "new and independent cause" to the jury over their timely objection. We agree with both of these contentions, and will discuss them together.

■ A "new and independent cause" is defined as an act or omission of a separate and independent agency which destroys the causal connection between the negligent act or omission of the defendant and the injury complained of, and thereby becomes the immediate cause of such injury. *Young v. Massey*, 128 Tex. 638, 101 S.W.2d 809 (1937). Such cause contemplates that an independent force rather than the alleged negligent acts of the parties was responsible for such injuries. *Goldstein Hat Mfg. Co. v. Cowen*, 136 S.W.2d 867, 873 (Tex.Civ.App.—Dallas 1939, writ dism'd). The element of "new and independent cause" should not be incorporated into the definition of proximate cause in the court's charge *unless it is in the case under the evidence. Young v. Massey*, 101 S.W.2d at 810; *North Texas Producers Association v. Stringer*, 346 S.W.2d 500, 507 (Tex.Civ.App.—Fort Worth 1961, writ ref'd n.r.e.).

■ In order to determine whether there is any evidence to raise "new and independent cause," this court must consider only the evidence and inferences which will support the inclusion of this element and disregard all evidence and inferences to the contrary. *See Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). After a careful review of the record, we find no evidence of sufficient probative force to support the inclusion of "new and independent cause" in the court's charge. Appellee contends that such submission was warranted because the record reflects that Galvan may have died from complications arising from his treatment and surgeries while hospitalized at Park Plaza. We agree that there is some evidence of post-operative complications resulting from Galvan's surgeries which may have weakened him, thereby hastening his death. Nevertheless, we do not believe this would constitute a "new and independent cause" as defined by our courts. It is well established in this State that one who wrongfully injures another is liable in damages for the consequence of the treatment administered by physicians selected in good faith and with ordinary care by the injured party. This liability was articulated in *Hicks Rubber Co. v. Harper*, 131 S.W.2d 749 (Tex.Civ.App.—Waco), writ dism'd, 134 Tex. 89, 132 S.W.2d 579 (1939):

> ... [T]his is one of the consequences that the Defendant should have anticipated as

a probable result of its negligent conduct. *Id.* at 751.

*See also Cannon v. Pearson,* 383 S.W.2d 565 (Tex.1964). It is undisputed that Joe Galvan was acutely ill upon admission to Park Plaza Hospital. Any and all subsequent treatment of Galvan while hospitalized was administered in an attempt to halt the deceased's deteriorating condition, ending in his death. The evidence does not support the inclusion of a definition of "new and independent cause" in the charge.

As appellee points out, it is a rare case in which the incorrect inclusion of "new and independent cause" in the jury charge is reversible error. *North Texas Producers Assoc. v. Stringer,* 346 S.W.2d at 507; *McCord v. Vilbig Construction Co.,* 417 S.W.2d 634, 638 (Tex.Civ.App.—Dallas 1967, writ ref'd n.r.e.). In our opinion, we are now confronted with just such a case wherein the submission of such definition was clearly harmful and was reasonably calculated to and probably did cause the rendition of an improper verdict. TEX.R. CIV.P. 434. We sustain appellants' point of error four.

We believe the jury's negative answer to proximate causation reflects its confusion with regard to the submission of "new and independent cause." In the record before us, the evidence leaves us with little doubt that Dr. Fedder's negligence in prescribing the drug, Diabinese, far in excess of that recommended by the manufacturer (and other medical experts who testified at trial), set in motion the following sequence of events: the excessive dose of Diabinese created a severe hypersensitive reaction, following which Galvan went into a crisis state. He was hospitalized, underwent two operations, suffered complications, and died. Appellee argues that because the deceased's hypersensitive reaction was unforeseeable, there is no proximate causation. We agree that hypersensitivity, in itself, may be unforeseeable. However, there is sufficient expert testimony in the record to establish that the severity of a hypersensitive reaction may be exacerbated by the level of dosage. Dr. Gordon McHardy, a gastroenterologist, testified that the excessive dose of Diabinese created a hypersensitive reaction in Galvan. While on cross-examination he admitted that regardless of the amount, Galvan would have had a hypersensitive reaction, he stated that the severity of the reaction was related to the dosage. Dr. Robert Altman, Senior Associate Medical Director of Pfizer Laboratories, the manufacturer of Diabinese, testified that a hypersensitive reaction can be increased in its severity by increasing the amount of drug the patient receives. In addition, when questioned, appellee testified that administering 1,000 milligrams of the drug daily for a period of time increases the risk of adverse reactions. He also made the following response:

Q. Do you agree with the manufacturer, Doctor, that higher sensitivity can be dose related and the higher the dose the more the patient will exhibit? Do you agree with that?

A. Under certain circumstances, yes.

Q. You don't think it is true about this drug Diabinese?

A. In some cases, right. Some cases may not.

In contrast, Dr. Phillips Kay Champion, Jr., an internist with Kelsey-Sebold Clinic, testified that a hypersensitive reaction is one which occurs regardless of the dose. However, he agreed that a loading dose should not have been used, and that appellee gave the deceased "too much" Diabinese. Point of error five is sustained.

In points of error one and two, appellants contend that (1) the jury's finding of zero damages for Joe Galvan's physical pain and mental anguish is contrary to the great weight and preponderance of the evidence and (2) the trial court erred in rendering a take nothing judgment because the evidence establishes conclusively that Galvan was injured. We agree. The facts are undisputed that the deceased suffered physical pain and mental anguish from mid-March 1978 until he died on June 12. We are not here presented with a question of inadequate damages, but rather with the

complete denial of any money damages for Galvan's pain and suffering. Generally, it is within the province of the jury to set damages. However, they have no authority to completely ignore the undisputed facts and arbitrarily deny any recovery. *Thomas v. Oil & Gas Bldg., Inc.,* 582 S.W.2d 873 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.); *Bazzano v. Ware,* 530 S.W.2d 650 (Tex.Civ.App.—Beaumont 1975, writ ref'd n.r.e.). We hold the jury's finding of no damages is, in fact, an arbitrary denial of recovery. We sustain appellants' first and second points of error.

In light of our disposition of appellants' points of error one, two, four, and five, we need not consider the remaining points.

The judgment of the trial court with regard to Dr. Larry L. Fedder is reversed and the cause remanded for trial.