**Joyce KNOLL and James Knoll, Appellants,**

v.

**Charles NEBLETT, M.D., Appellee.**

**No. 14–96–00226–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 5, 1998.

Rehearing Overruled March 5, 1998.

John Holloway, Houston, for appellants.

John Strawn, Merritt McReynolds, Houston, for appellee.

Before LEE, YATES and EDELMAN, JJ.

## OPINION

LEE, Justice.

This is a medical malpractice case. After a jury trial, the court below entered a take nothing judgment in favor of the physician, appellee, Dr. Charles Neblett. Joyce Knoll, appellant, who is joined in the suit by her husband, James, raises twenty-four points of error complaining that the trial court erred in denying her motion for directed verdict based on lack of informed consent, in submission of the charge, the admission of evidence, and that the jury's verdict is not supported by factually or legally sufficient evidence. We affirm.

### Background

The claims in this suit arise out of a surgical procedure performed on appellant's back in 1984 with the use of a laser and microscope. Appellant had a history of low back, hip and leg pain for several years before the surgery in question. Appellant had several previous back surgeries, beginning with surgery for a ruptured disk in 1977. Before that surgery, appellant had a myelogram and suffered a bad reaction from the dye used. After that surgery, appellant suffered from multiple infections, including bacterial meningitis. The physicians attending her discovered a rupture in the dura, the thin membrane lining the nerve, which had leaked spinal fluid after the laminectomy.[1] Appellee, a neurosurgeon, first operated on appellant when he was called in to assist in closing the dura in March 1977. Appellant returned to appellee for treatment throughout 1978. In 1979, after performing another myelogram using a different dye, appellee first diagnosed appellant with arachnoiditis, which is described as excessive scar tissue in the arachnoid, the tissue lining the outer surface of the nerves in the lower back, causing compression of the nerves.

In January of 1979, appellee performed another surgery on appellant, using hand

---

1. According to testimony, "laminectomy" is a general term used to describe surgery in the area of the spine. A "laminectomy" is defined as "removal of one or more laminae of the verte-brae." STEDMAN'S MEDICAL DICTIONARY 868 (2d ed. 1966). A "lamina" is a "thin plate or flat layer." Id. at 866.

held instruments, to alleviate the arachnoiditis. Appellant showed some improvement after the 1979 surgery, but began having more difficulty by the end of the year. She continued to see appellee for treatment. During this time, appellant was unable to sit and had to lie on a cot when attending church or visiting friends. She was able to walk in high heels. In March 1983, appellant and appellee began discussing another surgery, including the possible use of laser surgery for appellant's arachnoiditis. These discussions continued during her July 24, 1984 office visit, after which appellant decided to have surgery. It is disputed, however, as to what type of surgery appellant agreed to have appellee perform.

Appellee performed microlaser surgery on appellant's lower back to alleviate the scar tissue from arachnoiditis on October 8, 1984 at Methodist Hospital in Houston.[2] The results of this 1984 surgery are hotly disputed and form the subject of this suit. In her suit, appellant contends that as a result of appellee's negligence in performing this surgery, she has suffered partial paralysis, loss of bladder and bowel control, atrophy of the right leg, and other injuries. She also alleges the surgery was unnecessary and experimental and that appellee failed to obtain her informed consent. She asserts she would not have consented to the surgery had she been fully advised of the risks. She further alleges negligent misrepresentation and failure to disclose, and that her signature on the hospital's consent form was obtained through fraud.

After a jury trial, the trial court entered a take-nothing judgment based on the jury's verdict. This appeal resulted.[3]

## Informed Consent

In appellant's second point of error, she alleges the trial court erred in denying her motion for directed verdict because appellee failed to obtain her written informed consent for the laser surgery, the consent form incorrectly stated the reason for the surgery, and the form failed to state the risks associated with the surgery. The form described appellant's condition as "ruptured disc," and it is undisputed that appellant was not diagnosed with a ruptured disc before the 1984 surgery, but she had a ruptured disc repaired through surgery in the past. The consent form also stated that the surgical procedure planned was a "lumbar laminectomy with laser." It did not list specific risks involved in the procedure, but instead simply indicated "as Discussed with My Physician," which appellant initialed.

Under Rule 301 of the Texas Rules of Civil Procedure, a directed verdict is proper when:

(1) a defect in the opponent's pleadings makes them insufficient to support a judgment; (2) the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law; or (3) the evidence offered on a cause of action is insufficient to raise an issue of fact.

*M.N. Dannenbaum, Inc. v. Brummerhop,* 840 S.W.2d 624, 629 (Tex.App.—Houston [14th Dist.] 1992, writ denied). In our review, we consider all of the evidence in a light most favorable to the non-moving party, disregard all contrary evidence and inferences, and give the non-moving party the benefit of all inferences arising from the evidence. *See Qantel Business Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303 (Tex.1988). If there is any conflicting evidence, an instructed verdict is improper and the issue must go to the jury. *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983).

Recovery for a claim that a doctor failed to fully inform a patient of the risks of surgery is governed by the Medical Liability and Insurance Improvement Act (the Act). Tex. Rev.Civ. Stat. Ann. art. 4590i, § 6.02 (Vernon Supp. Pamph.1997). The Act created the Texas Medical Disclosure Panel, which prepares two separate lists of medical treat-

---

2. In the lumbar area of the back where appellant had surgery, the extension of the spinal cord is known as the "cauda equina," which is translated from Latin as "horse's tail" because the nerves spread out to the lower extremities.

3. Our opinion discusses appellant's points of error according to their subject matter rather than in numerical order.

ments and surgical procedures that do and do not require disclosure of risks, referred to respectively as List A and List B. *Id.* at § 6.04(b). Advising a patient of risks in compliance with the statute's required disclosure creates a rebuttable presumption that the physician was not negligent. *Id.* at § 6.07(a)(1). Failure to so disclose when required creates a rebuttable resumption that the doctor was negligent. *Id.* at § 6.07(a)(2).

■ Neither presumption is applicable in this case, however. The parties agree that the surgery at issue in this case is not on List A or B. In those cases where the Panel has not made a determination of the type of disclosure required, as here, the Act provides that the physician is under the "duty otherwise imposed by law." *Id.* at § 6.07(b). The Texas Supreme Court has defined this duty as being the same duty imposed in section 6.02 of the Act: "to disclose all risks or hazards which could influence a reasonable person in making a decision to consent to the procedure." *Peterson v. Shields*, 652 S.W.2d 929, 931 (Tex.1983).

For procedures on List A, the informed consent must be in writing. Section 6.06 of the Act provides: "Consent to medical care that appears on the panel's list requiring disclosure shall be considered effective under this subchapter if it is given in writing, signed by the patient or a person authorized to give the consent and by a competent witness, and if the written consent specifically states the risks and hazards that are involved in the medical care or surgical procedure in the form and to the degree required by the panel under [the Act.]" TEX.REV.CIV. STAT. ANN. art. 4590i, § 6.06 (Vernon Supp. Pamph. 1997). The Act makes no such requirement for procedures that are not on List A.

■ Because there were no statutorily required disclosures for this laser surgery in 1984, the Act does not require disclosure to be made in writing. Appellee testified that he explained to appellant the risks that a reasonable person would consider in deciding whether to have the laser surgery. Appellee testified he discussed the risks and possible complications of the laser surgery fully with appellant during an office visit in March 1983, and so noted in his office records.

Appellant acknowledged she remembered this discussion of the laser surgery in 1983. He again discussed the surgical risks with appellant during her next visit in July 1984, and again noted this discussion in his records. Appellee testified he told appellant he would "operate on the low back area, lumbar area, L4–5 the main area, some above and below and that we had to work on those nerves, had to take the scar tissue off these nerves external and internal, both as needed," and he would go "into the area of the cauda equina." He told her of the risk of death or that her condition could be worsened. He testified he told her that her pain, numbness, weakness, bladder and bowel problems could be increased and that she could become totally paralyzed. He warned of the possibility of spinal fluid leak and infection, hematoma and other problems associated with any surgery.

The defense expert, Dr. Robert Parrish, also a neurosurgeon, testified appellee complied with the standard of care and acted consistently with what an ordinary physician would have done. He testified that typically he explains the risks of surgery to the patient before the surgery, he writes a surgical order and sends it to the hospital, and a hospital nurse then fills in the consent form for signature. The "operative permit" in this case stated "lumbar laminectomy with laser," which was appropriate. Dr. Parrish explained that frequently some bone may be removed in an operation to remove scar tissue. Appellee testified that "laminectomy" was still the appropriate term to use, even though bone would not necessarily be removed. He testified that "lumbar laminectomy" commonly refers to any surgery in this region of the spine and the "generic" term was used to instruct the hospital to set up the operating room for that type of procedure. Appellant acknowledged that her 1977 surgery to repair a ruptured disk was also referred to as a "lumbar laminectomy." Appellee testified that the consent form was the hospital's form and his surgery was based not on the form but on what "she and I talked about doing." Dr. Parrish also testified that he does not check the consent form before surgery because at that point he is

aware that the patient has already accepted the risks and wants to proceed.

We find no authority supporting appellant's repeated insistence that the patient's consent must be in writing in this case. None of appellant's cited cases impose a requirement for a written consent form under facts such as these, either by statute or under the common law. *See, e.g., Barclay v. Campbell,* 704 S.W.2d 8 (Tex.1986) (holding that informed consent should have been submitted to the jury where there was some evidence showing the inherent risk of the medication prescribed could have influenced a reasonable person's decision and it was undisputed the risk had not been disclosed; the court did not impose a requirement for written consent in cases where the Panel has not determined the required disclosure); *Peterson,* 652 S.W.2d 929 (reversing a directed verdict where evidence presented a jury question on informed consent for a procedure for which the Panel has not determined the required disclosure; the court did not state written consent was required).

There is some evidence in the record that appellant was informed of the risks of the laser surgery. This evidence is sufficient to defeat entitlement to a directed verdict, even though the written consent form, prepared by the hospital, incorrectly named appellant's condition. Despite this error, appellant consented to a "lumbar laminectomy with laser," the appropriate procedure, not to surgery to repair a ruptured disc. The trial court did not err in denying appellant's motion for directed verdict. We overrule point of error two.

### Sufficiency of the Evidence

In appellant's legal sufficiency complaints, because she bore the burden of proof at trial, she must demonstrate on appeal that the evidence conclusively established all vital facts in support of the issue. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex. 1989). We examine the record for all evidence that supports the jury's finding, while ignoring the contrary evidence. *Id.* If there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a mat-

ter of law. *Id.* If the contrary proposition is established conclusively by the evidence, we will sustain the point of error. *Meyerland Community Imp. Ass'n v. Temple,* 700 S.W.2d 263, 267 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

To prevail on her factual sufficiency challenges, appellant must show that the adverse findings are against the great weight and preponderance of the evidence. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam). In conducting this review, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Id.* We must uphold the jury's finding unless it is so against the great weight and preponderance of the evidence as to be manifestly unjust or erroneous. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986). Contrary to appellant's suggestion, this court does not sit as a second jury.

In appellant's third and fourth points of error, she complains the trial court abused its discretion in denying her motion for new trial because the evidence is legally and factually insufficient to support the jury's negative answer to Question 2. Question 2 asked whether appellee failed to disclose the risks of the laser surgery that could influence a reasonable person in making a decision to give or withhold consent.

Evidence supporting the jury's verdict is recited above in connection with the discussion of appellant's motion for directed verdict. As noted, appellant testified he first discussed the possible use of laser surgery on appellant in March 1983. Specifically, he stated that he explained the difference in the 1984 operation from the one performed in 1979 would be that he would use the laser instead of hand-held instruments. He testified he explained how the laser worked, and that there is less risk of damage to the nerves because the laser is a very precise and delicate instrument. He testified he told appellant surgery would be performed in the L4–5 area, that it would be in the area of the cauda equina, both outside and inside the dura. Appellee testified he explained the risks of surgery, including the possibility of death, worsening of function, increased pain,

more numbness, possible paralysis, and increased problems with her bladder and bowel function. He explained that he could not undo damage already done to the nerve from years of pressure, but that he hoped to relieve the pressure on the nerves to reduce her pain. He testified he did not press the surgery and that he and appellant talked in great detail over several office visits. Appellee further testified that appellant appeared to understand the risks. He testified he gave appellant non-surgical options including continued physical therapy, acupuncture, pain management therapy, biofeedback, and changing her medication.

Appellee's records were admitted into evidence and notes from July 25, 1984 stated in relevant part:

> The possible causes of her difficulty as well as the modes and evaluation of her treatment were discussed as to their purposes, state of development and possible complications.

Appellee testified appellant did not express any fear of having the dura opened during surgery. Appellee testified that he sent his notes of office visits to appellant for review, presumably because of her active interest and background in nursing, and she returned them with corrections. Appellant did not alter the portions of the records indicating that appellee had fully discussed the laser surgery with her. In addition, none of the records indicated that appellant was suffering from a ruptured disk in 1984, thereby discrediting her assertion that she understood the 1984 surgery was only to repair a ruptured disk. The history she gave a subsequent physician in 1986 indicated the 1984 operation was "spinal surgery to remove scar tissue." Also, appellee pointed out that appellant made no claim for lack of informed consent when she originally sued in 1986, and she did not add that claim until December 1993. During appellee's continued treatment of appellant during 1984 through 1986, she made no complaints about the type of surgery performed.

The contrary evidence consists primarily of the mistake on the consent form and appellant's denial that she was explained or understood the risks of the laser surgery. Appellant testified appellee told her there were not "any complications" inherent in the surgery to be performed. She testified there is "no way" she would permit surgery into the dura covering her spinal cord after the problems she experienced before. Appellant's husband, James, also testified that appellee did not explain the risks of surgery and they did not understand appellee intended to open the dura and operate in the area of the cauda equina. The consent form did not so state, nor did it list the possible risks and complications. Appellee admitted the consent form incorrectly described appellant's condition as "ruptured disc," but he testified he did not prepare the form and did not review it prior to surgery. He testified he performed the surgery that he had discussed with appellant, and did not proceed according to the hospital's form.

■ This evidence contrary to the jury's verdict is not so overwhelming as to render their verdict unjust. The jury, as the sole judge of the credibility of the witnesses and the weight to be given to their testimony, was entitled to discount the testimony of any witness. *Skrepnek v. Shearson Lehman Bros., Inc.*, 889 S.W.2d 578, 579 (Tex.App.—Houston [14th Dist.] 1994, no writ). Appellant acknowledged that she had a stroke before trial and her memory had been affected. Appellant's assertion that she believed she was undergoing surgery for a ruptured disk is in complete contradiction of voluminous medical records. As such, the jury may have discredited much of her testimony. We conclude the evidence is factually sufficient to support the jury's answer to question 2 on disclosure of risks. Accordingly, we overrule points of error three and four.

■ In points of error nine and ten, appellant contends that the jury's failure to find negligence in answer to Question 1 is not supported by legally or factually sufficient evidence. The question asked if any negligence by appellee in performing the laser surgery caused injury to appellant.

Appellee testified he did not perform the surgery negligently. His operative report stated: "A quite excellent freeing of the cauda equina and nerve roots as they exited was

possible." Appellee denied that the 1984 laser surgery was experimental. Appellee testified that by 1980 lasers were being used extensively in neurosurgery, and that it was appropriate to use a laser for appellant's surgery. He began using lasers on patients at the end of 1980 or beginning of 1981. Appellee helped develop the laser used on appellant. Appellee testified he had used a laser thirty to forty times in the area of the cauda equina before appellant's surgery. He also testified that a microlaser had many advantages in this type of surgery, including that it is very precise, delicate, controlled, does not cause scar tissue formation, and it seals blood vessels so there is almost no bleeding during surgery. He testified that water is a barrier to the type of $CO_2$ laser he uses, and therefore, the cerebral spinal fluid protects the nerve from the thermal effects of the laser. Dr. Parrish also testified appellee complied with the standard of care in performing the surgery, and was not negligent in any way. He testified the surgery appellee performed was an acceptable neurosurgical procedure, consistent with the standard of care for neurosurgeons. Dr. Parrish testified it was appropriate to use a laser to perform this type of surgery, and it was not considered experimental in 1984.

In addition, there is evidence that appellee's conduct did not proximately cause injury to appellant. Appellee testified he did not cause any injuries to appellant. Appellant underwent another surgical procedure on her back in 1989. Dr. Pedro Caram implanted a dorsal column stimulator near her spine to relieve her pain. After that surgery, appellant was seen by another neurosurgeon, Dr. Rose, in August 1990, whose records reflect that appellant "looks wonderful," "leg pain almost gone," "normal strength in legs," and that appellant had lost weight and was exercising more. Dr. George Sibley, appellant's expert, agreed appellant's medical records showed improvement in 1989 and 1990, which he would not expect if appellee's surgery had permanently damaged appellant. The medical records show that after the 1984 surgery appellant could lie on her back and turn from side to side, and she had not been able to do that for six years. She underwent physical therapy at the hospital after the 1984 surgery and before her release the notes showed she could walk 450 feet with a cane, where before surgery she could only walk about 100 feet. Dr. Parrish testified that because appellant improved after the 1984 surgery, but got worse after 1990, her problems resulted from the natural progress of her disease. He explained that the scarring from arachnoiditis is a progressive disease, and the progress of the disease was "set back" by the 1984 surgery. Dr. Parrish believed that appellant is in better condition today because of the 1984 surgery. Evidence in the medical records also showed that appellant's bladder problems may not have been caused by the 1984 surgery because appellant had a history of bladder problems since the mid–1950s, and she was diagnosed with a neurogenic bladder in 1977. Dr. Parrish also testified that it would be "tough" to damage appellant's nerves in this surgery to the degree that would cause loss of bladder and bowel function as appellant described.

In view of this evidence supporting the jury's verdict, appellant's legal sufficiency challenge must fail. Our review of other evidence in the record that is contrary to the jury's verdict shows the following. Dr. Sibley, appellant's expert, testified he had not examined appellant, but that he reviewed her records. In his opinion, appellee was negligent in performing surgery where not properly indicated, and that the laser surgery in close proximity to the nerves in the cauda equina caused irreparable damage to those nerves. Dr. Sibley testified that while appellant had problems with pain and weakness in her right leg before surgery, in his opinion, the atrophy of her right leg was caused by nerve damage that occurred during the 1984 surgery. He explained that he found appellee negligent in failing to obtain necessary tests, including a myelogram, to properly evaluate arachnoiditis. Appellee testified, however, and his records indicated, that appellant preferred to "proceed with reexploration without myelogram studies." He also testified that a myelogram was not needed to establish a diagnosis because he was aware of her arachnoiditis through her history. He also had the results of a CAT scan performed in March 1983.

Dr. Sibley testified that the records showed that physical examinations did not justify the surgery. Dr. Sibley was of the opinion that appellant's arachnoiditis was permanent and not amenable to surgery, which was the same opinion appellee had written in a letter three years before the surgery to help appellant obtain Social Security disability benefits. Appellee testified, however, that three years later, at the time of appellant's surgery, he better understood the applicability of the microlaser for treatment of arachnoiditis. Therefore, by 1984, laser surgery could alleviate some of the scar tissue.

Dr. Myles Saunders, a neurosurgeon from California, testified by video deposition and agreed that the absence of a myelogram, CT scan or MRI of the spine immediately before surgery violated the standard of care in evaluating the necessity for surgery. He conceded that it would not violate the standard of care for a surgeon to proceed without a myelogram if a CAT scan from a reasonable time before surgery were available. Dr. Saunders also agreed that laser surgery on arachnoiditis violated the standard of care because it would not clinically benefit the patient and would be expected to injure sensitive nerve roots. He viewed the laser surgery to remove scar tissue in the cauda equina as experimental.

Appellant provided evidence from her medical records detailing the problems she experienced after the 1984 surgery. These records indicated complaints of low back pain, weakness in the lower extremities, right leg numbness, and pain in her legs. Appellant also testified that after the surgery she was paralyzed and could not move either leg and had lost the ability to control her bladder and bowels. Appellee told her these problems were temporary, but she continues to have bladder and bowel control problems and cannot walk in high heels as she could before

the 1984 surgery. She still has numbness in her leg and has a wasting of the muscles in her right leg.

The medical records contradicted much of appellant's testimony. For example, she asserted her legs were paralyzed, yet records confirmed she was able to walk farther than before. She denied that she had bowel problems before the 1984 surgery, and the records repeatedly note prior problems. When confronted with inconsistencies in her testimony and the records, appellant asserted that the records of virtually every hospital and doctor were wrong.

When the evidence is in conflict and there is substantial evidence to support a jury's answer either way, the conclusion reached by the jury is not manifestly unjust. *See Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 797 (1951); *Middleton v. Palmer,* 601 S.W.2d 759, 766 (Tex.Civ. App.—Dallas 1980, writ ref'd n.r.e.). Because the evidence is conflicting and the jury was permitted to evaluate the credibility of the witnesses and the weight to place on their testimony, we should not disturb the verdict. This court is not a fact finder, so we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if the evidence would support a different result. *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). We conclude the evidence is legally and factually sufficient to support the jury's answer to question one, and we overrule points of error nine and ten.

In points of error thirteen and fourteen, appellant contends the negative answer to Question 5 on fraud is not supported by legally or factually sufficient evidence. The jury was asked if appellee acted fraudulently, and an appropriate definition with the elements of fraud was included.[4]

4. Question No. 5 stated:
 Fraud occurs when—
 a. a material misrepresentation is made;
 b. the representation is false;
 c. the person who made the representation either knew it was false or the statement or representation was made recklessly without

any knowledge of its truth and as a positive assertion;
 d. the speaker made it with the intention that the person to be acting thereon should act upon such representation;
 e. the party injured thereby did act in reliance thereon; and

Appellant's only argument under these points is that appellee admitted the consent form was incorrect in stating that appellant's condition was a "ruptured disc." Appellee testified that he explained the risks and complications that could influence a reasonable person in making the decision to have the laser surgery. Dr. Parrish agreed appellee had met the appropriate standard of care for disclosure.

Appellant has not demonstrated that there is legally or factually insufficient evidence to support the jury's failure to find fraud. We overrule points of error thirteen and fourteen.

In points of error sixteen through nineteen, appellants contends that there is legally and factually insufficient evidence to support the jury's "zero" findings on damages in Questions 7 and 8. She argues that all surgery produces some injury, pain and mental anguish and a finding of zero damages does not comport with common knowledge.

■ Appellant acknowledges the well-established rule of law that a finding of zero damages is immaterial in the absence of liability findings. *See, e.g., Southern Pine Lumber Co. v. Andrade*, 132 Tex. 372, 124 S.W.2d 334, 335 (1939); *Winkle v. Tullos*, 917 S.W.2d 304, 318 (Tex.App.—Houston [14th Dist.] 1995, writ denied); *Ramsey v. Lucky Stores, Inc.*, 853 S.W.2d 623, 635 (Tex.App.— Houston [1st Dist.] 1993, writ denied). Appellant asks this court to ignore this line of authority. We decline her request and overrule points of error sixteen through nineteen.

### Charge Error

■ Half of appellant's points of error concern charge error, either in the charge as submitted, or the failure to submit appellant's requested instructions and questions. We review charge error under an abuse of discretion standard while recognizing that there is a presumption in favor of broad-form submission of questions. *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649

f. the person relying upon such statement suffered an injury in relying upon the representation.
Do you find that *Dr. Charles Neblett* acted fraudulently?

(Tex.1990). Rule 278 requires the trial court to submit requested questions to the jury if the pleadings and any evidence support them. TEX.R. CIV. P. 278; *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex.1992). The trial court has wide discretion in submitting explanatory instructions and definitions. *Penick v. Christensen*, 912 S.W.2d 276, 287 (Tex. App.—Houston [14th Dist.] 1995, writ denied). Instructions and definitions are proper when they are raised by the written pleadings, supported by the evidence, and they aid the jury in answering the questions in the charge. TEX.R. CIV. P. 277, 278.

Failure to submit a question on which the requesting party has the burden of proof is reversible error only if the question was requested in writing in substantially correct form. TEX.R. CIV. P. 278. It is not reversible error to fail to submit "other and various phases or different shades of the same question." *Id.*

■ If error in the charge is found, we then review the pleadings, evidence, and the entire charge to determine if the error is harmful. *Island Recreational Dev. Corp. v. Republic of Texas. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986). To reverse a judgment based on error in the charge, appellant must establish the error complained of (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals. TEX.R.APP. P. 44.1(a).

■ In her first point of error, appellant contends the trial court abused its discretion in overruling her objections to submission of a "new and independent cause" instruction because there was no evidence to support it and it constituted a prejudicial comment by the court. In addition to the definition of "proximate cause," the jury was instructed that:

"NEW AND INDEPENDENT CAUSE," means the act or omission of a separate and independent agency, not reasonably

Answer "Yes" or "No".
Answer: <u>No</u>

foreseeable by a neurological surgeon exercising ordinary care, that destroys the causal connection, if any, between the act or omission inquired about in the occurrence in question and thereby becomes the immediate cause of such occurrence.

Thus, the court's instruction correctly informed the jury that an intervening cause cannot be reasonably foreseeable by the defendant to be considered a new and independent cause as to break the chain of causation between the defendant's negligence, if any, and the injury complained of to the extent of relieving the defendant of liability for injury. *See Wolf v. Friedman Steel Sales, Inc.*, 717 S.W.2d 669, 672 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.).

Appellant cites *Galvan v. Fedder*, 678 S.W.2d 596 (Tex.App.—Houston [14th Dist.] 1984, no writ) as a "mirror image" case requiring reversal. In *Galvan*, however, the jury found the defendant doctor negligent. *Id.* at 597. The jury failed to find proximate cause, and this court concluded this failure was based on inclusion of an erroneous "new and independent cause" instruction for which there was no support in the evidence.[5] *Id.* at 599. The new cause of the patient's injury was alleged to be complications arising from his treatment and surgeries, which should have been anticipated as a result of his negligent conduct and was not therefore a *new* cause of injury. *Id.* at 598–99.

Appellee asserts that the instruction in this case was supported by the evidence and pleadings and was in correct form. He cites to evidence in the record of other causes of appellant's injuries, including her previous and subsequent surgeries and the natural progression of her disease over time.

Some of the salient considerations in determining whether an act is a concurring or a new and independent cause of harm to another are found in Restatement (Second) of Torts Section 442 (1986), and adopted in Texas in *Humble Oil & Refining Company v. Whitten*, 427 S.W.2d 313 (Tex.1968). These considerations are as follows:

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening forces operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Humble Oil & Refining*, 427 S.W.2d at 315. Based upon these considerations, we agree with appellant that the evidence cited by appellee does not constitute a *new* and independent cause of her injury. Previous surgeries are not subsequent events, and the natural progression of her disease was foreseeable. While appellant had a subsequent surgery on her back in 1989, there was no evidence that her problems were caused by the 1989 surgery. Therefore, we agree that the trial court should not have submitted the "new and independent cause" instruction.

However, our review of the evidence in the record and the jury's answers to the charge mandates the conclusion that the inclusion of this instruction did not harm appellant. Reversible error occurs when evidence of a new and independent cause is raised and the court fails to include it in the charge to the jury. *Baley v. W/W Interests, Inc.*, 754 S.W.2d 313, 319 (Tex.App.—Houston [14th Dist.] 1988, writ denied). However, "it is a rare case in which the incorrect inclusion of 'new and independent cause' in the jury charge is reversible error." *Galvan*, 678 S.W.2d at 599. First, the jury found no

5. The instruction submitted in *Galvan* was essentially the same as that used here.

damages in this case. Second, in contrast to *Galvan,* there is sufficient evidence in this record that appellee was not negligent. In addition, there is ample evidence of other causes of appellant's injury, which, while not *new* so as to warrant an instruction, still mitigate against a finding that the 1984 surgery was a proximate cause of appellant's problems. Appellant's expert, Dr. Sibley, agreed that before the 1984 surgery, appellant's nerves had suffered a number of injuries. Records from appellant's subsequent neurosurgeon, Dr. Rose, and from a urologist named Dr. Cook, showed that she was doing extremely well in 1990. Dr. Parrish testified that if the surgery performed by appellee in 1984 had injured appellant, he would not expect her to have such good function as the 1990 records showed. He gave his opinion that appellant's decline after 1990 was due to the progress of her disease.

We conclude the inclusion of the instruction on "new and independent cause" did not cause rendition of an improper verdict and therefore was harmless. *See Eoff v. Hal and Charlie Peterson Foundation,* 811 S.W.2d 187, 193 (Tex.App.—San Antonio 1991, no writ) (finding the inclusion of "new and independent cause" harmless where it would not have affected the jury's verdict). Accordingly, we overrule point of error one.

Appellant raises several complaints about the broad-form submission used by the trial court. First, she complains in several points that the submission of the issue of informed consent was improper.

■ In her fifth point of error, she complains that Questions 2, 3, and 4 on informed consent deny her an appropriate submission of her theory of recovery. Question No. 2 asked:

> Did *Dr. Charles Neblett* fail to disclose to *Mrs. Joyce Knoll* such risks and hazards inherent in the 10/8/84 laser surgery that could have influenced a reasonable person in making a decision to give or withhold consent to such treatment?

Answer "Yes" or "No".

Answer: *No*

Questions No. 3 and 4 were conditioned on an affirmative answer to Question No. 2, and therefore were not answered.[6]

■ An action for the failure of a doctor to fully inform a patient of the risks of surgery is a negligence cause of action. *McKinley v. Stripling,* 763 S.W.2d 407, 409 (Tex.1989). "[T]he only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent." Tex.Rev.Civ. Stat. Ann. art. 4590i, § 6.02 (Vernon Supp. Pamph.1997).

Questions No. 2, 3, and 4 are submitted according to the recommendation in the Pattern Jury Charges. *See* 3 State Bar of Texas, Pattern Jury Charges, PJC 51.12 (1990). They are in substantially correct form and are supported by the evidence. We hold the trial court did not abuse its discretion in submitting these questions.

■ In points of error six and seven, appellant complains that the trial court refused to submit her alternative instructions defining informed consent and her interpretation of the requirements of the Act. Appellant tendered sixteen alternative questions and instructions on informed consent, which were refused by the trial court, and are set forth as follows:

## QUESTION NO. A

Did Dr. Neblett fail to obtain Mrs. Joyce Knoll's written informed consent for the laser surgery performed in the patient's cauda equina spinal area on October 8, 1984?

## ALTERNATIVES

#1 "INFORMED CONSENT" involves that consent given for a surgery into the cauda equina spinal area to remove scar

---

6. Question No. 3 asked:
 Would a reasonable person have refused such treatment if those risks and hazard had been disclosed?
 Question No. 4 asked:
 Did *Mrs. Joyce Knoll* suffer any injury or damages as a proximate cause of *Dr. Charles Neblett's* failure to obtain *Mrs. Joyce Knoll's* informed consent?

tissue or adhesions. Such surgery requires the physician to fully advise the patient of all the present and future risks, dangers, hazard or complications inherent in the patient undergoing such a surgical procedure, together with information as to the alternatives of medical treatment which may involve less risks, dangers, hazards or complications, so that the patient may make an intelligent and fully informed decision whether to accept the surgery or refuse the surgery.

#2 The law of Texas requires that Dr. Neblett obtain from Mrs. Knoll a "written consent" before surgery which states (1) the medical condition for which a surgery is to be performed, (2) the nature and extent of t he surgery to be performed, and (3) the risks, dangers, hazards, or complications inherent in the proposed surgery.

#3 In this case, you are instructed that the written consent (1) does not correctly state the medical condition for which Dr. Neblett performed the surgical procedures, (2) does not state that the surgery would be performed upon nerves in the cauda equina area of the spine to remove scar tissue, and (3) does not state what risks, hazards, dangers or complications where [sic] inherent to such surgery.

#4 Therefore, you are instructed that Dr. Neblett did not have a lawful written consent from Mrs. Joyce Knoll for the surgery performed upon her on October 8, 1984.

## QUESTION NO. B

Did Dr. Neblett fail to obtain Mrs. Joyce Knoll's written informed consent for the laser surgery performed in the patient's cauda equina spinal area on October 8, 1984?

## ALTERNATIVES

#1 "INFORMED CONSENT" involves that consent given for a surgery into the cauda equina spinal area to remove scar tissue or adhesions. Such surgery requires the physician to fully advise the patient of all the present and future risks, dangers, hazards or complications inherent in the patient undergoing such a surgical procedure, together with information as to the alternatives of medical treatment which may involve less risks, dangers, hazards or complications, so that the patient may make an intelligent and fully informed decision whether to accept the surgery or refuse the surgery.

#2 You are further instructed that in answering Question No. ___, that because of the physician's superior knowledge of the risks or hazards of laser surgery in the cauda equina area of the spine and risks or complications of the procedure, and because of the trust and confidence imposed in the physician's diagnosis, care or treatment of a patient's medical problems, injuries or illnesses, that a physician has an affirmative duty to disclose to a patient all present and future risks, hazards, dangers or complications involved in such surgery which could influence a reasonable person in making a decision to consent to the procedure.

#3 The law of Texas requires that Dr. Neblett obtain from the patient a "written consent" stating the surgery to be performed and the relative risks, complications or dangers inherent in the patient submitting to the surgery. In this case, you are instructed that the written consent did not state that surgery was to be performed in the cauda equina area of the spine and did not state what risks, hazards, dangers or complications where [sic] inherent to such a procedure. Therefore, you are instructed that Dr. Neblett did not have the written consent of Mrs. Joyce Knoll for the laser surgery of the nerves in the cauda equina area of her spine.

#4 A patient has the right to determine what risks to his health or welfare he will be subjected because of surgical treatment, and a physician cannot withhold material facts concerning suggested treatment or misrepresent the nature

and extent of the surgery or medical reason for the surgery.

## C

### ALTERNATIVELY

\# 1 You are further instructed that in answering Question No. ___, that because of the physician's superior knowledge of the risks or hazards of laser surgery in the cauda equina area of the spine and risks or complications of the procedure, and because of the trust and confidence imposed in the physician's diagnosis, care or treatment of a patient's medical problems, injuries or illnesses, that a physician has an affirmative duty to disclose to a patient all present and future risks, hazards dangers or complications involved in such surgery which could influence a reasonable person in making a decision to consent to the procedure.

\# 2 A patient has the right to determine what risks to his health or welfare he will be subjected because of surgical treatment, and a physician cannot withhold material facts concerning risks or complications which could influence a reasonable patient's decision concerning suggested surgical treatment, or misrepresent the medical condition for which surgery is to be performed.

## QUESTION NO. D

Did Dr. Neblett fail to obtain Mrs. Joyce Knoll's written informed consent if any for the laser surgery performed in the patient's cauda equina spinal area on October 8, 1984?

"INFORMED CONSENT" involves that consent given for a surgery into the cauda equina spinal area to remove scar tissue or adhesions. Such consent for surgery requires the physician to advise the patient of all the material risks, dangers, hazards or complications inherent in the patient undergoing such a surgical procedure, together with information as to the alternatives of medical treatment which may involve less risks, dangers, hazards or complications, so that the patient may make an intelligent and fully informed decision whether to accept the surgery or refuse the surgery.

### ALTERNATIVES

\# 1 You are instructed that in answering Question No. D that the term "INFORMED CONSENT" means that consent to surgery given by a patient after being advised of all of the inherent material risks, dangers, hazards or complications associated with laser surgery of the nerves in the cauda equina area of the spine which could influence a reasonable persons [sic] to make an intelligent choice to either accept or refuse the surgery.

\# 2 Texas law requires that a physician is liable for any injury or damages suffered by a patient as a result [of] submitting to a surgery where the patient's informed consent has not been obtained in writing, witnessed by a credible person, stating the nature of the medical problem for which surgery is recommended, the nature and extent of the surgery to be performed, and a listing of the inherent material risks, dangers, hazards or complications associated with such surgery.

## E

### ALTERNATIVES

\# 1 You are instructed that the Medical Liability Act of Texas, as enacted to cover medical or surgical procedures after 1977, requires a physician to obtain a patient's written consent for surgery, witnessed by a credible person, which focuses on the disclosure of risks which could influence a reasonable person in making a decision as to whether to accept or refuse recommended medical or sugical [sic] treatment in view of the risks involved. The law requires that the written consent form contain a description of the surgery to be performed, the medical reasons why the surgery is to be performed, and a statement of the material inherent risks, dangers, haz-

ards or complication[s] associated with such surgery.

# 2 The Act also established the Texas Medical Disclosure Panel, consisting of six doctors and three lawyers to be appointed by the Commissioner [sic] of Health, to review the medical and surgical matters which required a disclosure of risks, and that the Panel determine what risks should be disclosed to a patient about certain procedures. If such risks are listed upon a written consent form, then a "legal presumption" exists that the patient's informed consent has been obtained. However, if the written consent form does not contain a list of risks inherent in the surgery, then a "legal presumption" exists that the patient's informed consent has not been obtain[ed] by the surgeon.

# 3 You are further instructed that the Texas Medical Disclosure Panel has not determined the risks inherent in a laser surgery of scar tissue of nerves in the cauda equina of the spine, and that under such circumstances that Dr. Neblett was under the duty to obtain a written consent form from Mrs. Knoll which listed all of the inherent risks, dangers, hazards or complications of the surgery, and to state in language that the patient could understand the reason for the surgery and a description of the surgery to be performed. In the absence of such written consent, a surgeon is liable [sic] to the patient for damages suffered as a result of the actual surgery performed.

First, we note that Rule 274 specifically states that "[w]hen the complaining party's objection, or requested question, definition, or instruction is, in the opinion of the appellate court, obscured or concealed by voluminous unfounded objections, minute differentiations or numerous unnecessary requests, such objection or request shall be untenable." TEX.R. CIV. P. 274. Therefore, we conclude the trial court acted within its discretion in refusing appellant's requests on the basis of Rule 274.

In addition, appellant failed to submit proposed questions and instructions in substantially correct form because appellant's proposed instructions defining informed consent misstate the law. The party complaining of the failure to include an instruction in the charge must tender a substantially correct instruction or the error is waived. TEX.R. CIV. P. 278.

Appellant's requested instructions contain several incorrect statements of law. First, many of the instructions incorrectly informed the jury that appellee was required to inform appellant of "all risks" of the proposed surgery. Instead, he was required to inform only of those inherent risks *material* to a reasonable person's decision. *See Peterson,* 652 S.W.2d at 931; *Winkle,* 917 S.W.2d at 314. In addition, some of the requested instructions refer to a requirement for a "written" consent, which is incorrect.

▇ We also remind appellant that broad-form submission is the required practice in this state and was proper in this case. The amendment of Rule 277 to require broad-form submission was designed to abolish the submission of issues "distinctly and separately" as required under the old rule. *Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931, 937 (Tex.1980). Broad-form questions shall be submitted "whenever feasible." TEX.R. CIV. P. 277. The Texas Supreme Court has determined that "whenever feasible" means "in any instance in which it is capable of being accomplished." *E.B.,* 802 S.W.2d at 649. The rule unequivocally requires the trial court to submit broad-form questions "unless extraordinary circumstances exist." *Id.* Broad-form submission may not always be feasible when the law on a liability issue is unsettled. *Westgate, Ltd. v. State,* 843 S.W.2d 448, 455 n. 6 (Tex.1992). In this case, negligence law in a medical malpractice action is well settled. Appellant has not alleged any extraordinary circumstances warranting deviation from the accepted rule, and we find none. *See Merckling v. Curtis,* 911 S.W.2d 759, 771 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (holding that a medical malpractice case presented no extraordinary circumstances precluding broad-form negligence question in lieu of specific questions). We overrule points of error five, six, and seven.

In point of error eight, appellant contends the trial court abused its discretion in failing to submit her alternative questions and instructions about appellee's negligence in failing to review the consent form before surgery. First, only one broad-form negligence question was needed. In addition, there was no testimony that the standard of care required review of the consent form. Dr. Parrish did concede that it may be a good idea, but that he did not do it in practice. In the absence of evidence that appellee had a duty to review the consent form, the trial court did not abuse its discretion in refusing appellant's proposed submission. We overrule point of error eight.

 Appellant complains in point eleven that the trial court abused its discretion in overruling her objection to submission of a single broad-form negligence question in Question 1. We have previously determined that a broad-form general negligence question, instead of several questions about specific acts of negligence, is proper in a medical malpractice action. *Winkle*, 917 S.W.2d at 316. As already noted, broad-form was proper in this case. We overrule point of error eleven.

 In point of error twelve, appellant complains that submission of broad-form negligence and proximate cause questions deny her due process, equal protection, a fair jury trial, and her right to open courts as guaranteed by the Texas constitution. Appellant has waived this complaint because she failed to object to the question on constitutional grounds in the court below. Objections on appeal must conform to those made at trial or they are waived. *Scurlock Permian Corp. v. Brazos County*, 869 S.W.2d 478, 484 (Tex.App.—Houston [1st Dist.] 1993, writ denied). We overrule point twelve.

 Appellant complains in point of error fifteen that the trial court abused its discretion in overruling her objection to the predication of Question 6 on causation on an affirmative answer to Question 5 on fraud. Appellant argues that the predication of causation was prejudicial because it "telegraphed" to the jury the importance of one question over another, "signaling" the jury the court's "preference as to what findings he thinks should be made." However, she fails to support this argument with authority, and we find none. A point of error must be supported by argument and authorities to be properly before the court on appeal. *Hunter v. NCNB Texas Nat'l Bank*, 857 S.W.2d 722, 725 (Tex.App.—Houston [14th Dist.] 1993, writ denied). Traditionally, it has been permissible to predicate causation on an affirmative finding of negligence, and we see no reason why a fraud finding may not also be so conditioned. *See Johnson v. Whitehurst*, 652 S.W.2d 441, 447 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). We overrule point of error fifteen.

In point of error twenty, appellant contends the trial court abused its discretion in refusing her alternative questions on negligence and proximate cause. These proposed submissions are not in broad form. Instead, they enquire of specific acts of negligence.[7] For the reasons previously discussed, the

---

7. Appellant's proposed submission included separate inquiries for the following specific acts of alleged negligence:

using the $CO_2$ laser to attempt to remove scar tissue or adhesions, if any, in the area of the cauda equina;

diagnosing the patient suffered from a ruptured disc, which required surgery to remove pressure on a nerve;

using the $CO_2$ laser in connection with vaporizing tissue in the area of nerves of the spinal lumbosacral area;

failing to keep a proper lookout so as to avoid injury or damage to nerves in the area of surgery while using the $CO_2$ laser or surgical instruments;

experimentally using the $CO_2$ laser in the cauda equina to remove scar tissue or adhesions, if any, where a reasonable and prudent neurosurgeon, under the same or similar circumstances, would not attempt such surgery with a $CO_2$ laser in view of the risk of permanent thermal injury or damage to nerves in that area, associated with lasers;

failing to examine the written consent form obtained at Methodist Hospital before surgery in order to determine if the reason for the surgery, the description of the nature and extent of surgery to be performed, and the list of risks, hazard, dangers or complications of the surgery was correctly stated in the written consent;

failure to obtain a myelogram or CT scan of appellant in connection with the diagnosis that she required surgery in 1984.

trial court did not abuse its discretion in refusing appellant's requests. We overrule point of error twenty.

▮ In point twenty-one, appellant contends the court abused its discretion in refusing her alternative issues on fraudulent, negligent or intentional misrepresentations relative to the surgery. This court has previously determined that the trial court is not required to submit a separate question on negligent misrepresentation when the plaintiff contends surgery was performed without informed consent. *Penick*, 912 S.W.2d at 290. A claim for lack of informed consent is a negligence cause of action. TEX.REV.CIV. STAT. ANN. art. 4590i, § 6.02 (Vernon Supp. Pamph.1997). Claims for fraudulent or negligent misrepresentation are subsumed in the broad-form informed consent question. To include separate questions as to misrepresentations would mean reverting to the rejected practice of submitting issues "distinctly and separately." We overrule point twenty-one.

In point of error twenty-two, appellant contends the trial court abused its discretion in refusing her alternative issues of negligence in using the laser surgery to remove scar tissue in the cauda equina, performing experimental laser surgery, and performing surgery not covered by a written consent form. In point of error twenty-three, appellant contends the trial court abused its discretion in refusing her question on negligence in failing to obtain a "correct" written consent for the laser surgery. Again, these requests are not in broad-form. Because appellant failed to tender her proposed requests in substantially correct form, the trial court did not abuse its discretion in refusing them. We overrule points of error twenty-two and twenty-three.

### Admission of Evidence

▮ Finally, in point of error eight-A, appellant contends the trial court erred in overruling her objection to the testimony from appellee in response to a question asking whether he advised appellant of the risks of laser surgery that might influence a reasonable person to refuse surgery. She also argues that the court's comment in overruling the objection that the defendant "could answer the question" was prejudicial. According to the record, the trial court actually stated, "You can ask him his opinion."

A complaint based on the improper admission of evidence is reviewed under an abuse of discretion standard. *Jackson v. Van Winkle*, 660 S.W.2d 807, 810 (Tex.1983). To obtain reversal of a judgment based on an error in the admission or exclusion of evidence, appellant must show that the error probably caused the rendition of an improper judgment. *See Mancorp. Inc. v. Culpepper*, 802 S.W.2d 226, 230 (Tex.1990); TEX.R.APP. P. 44.1(a).

▮ Because appellee is an expert witness, he may give his opinion of the risks a reasonable person could consider. Appellant cited no authority holding that an expert may not so testify. Texas Rule of Civil Evidence 702 provides that if scientific, technical or other specialized knowledge will assist the trier of facts to understand the evidence or to determine a fact in issue, then a witness who is qualified as an expert may testify thereto in the form of an opinion or otherwise. Rule 704 permits testimony to be presented before the jury even if it embraces an ultimate issue to be decided by the trier of facts. TEX.R. CIV. EVID. 704. An expert may state an opinion on a mixed question of fact and law as long as the opinion is confined to the relevant issues and is based on proper legal concepts. *Louder v. DeLeon*, 754 S.W.2d 148, 149 (Tex.1988); *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 365 (Tex. 1987).

▮ The court's ruling was not a comment on the evidence. While Rule 277 forbids a trial court from directly commenting on the weight of the evidence in its charge, it is not objectionable that the charge may incidentally make such a comment. *See Briseno v. Martin*, 561 S.W.2d 794, 796–797 (Tex.1977). Rather, the instruction is rendered an impermissible comment when it indicates the judge's opinion concerning a matter to be determined by the jury. *See Sutherland v. Illinois Employers Ins. Co.*, 696 S.W.2d 139, 141 (Tex.App.—Houston [14th Dist.] 1985, no writ). The trial court's

comment in this case that the defendant could give his opinion does not amount to a comment on the weight of the evidence. Instead, it was not an instruction to the jury, but was simply an acknowledgment that the defendant, testifying as an expert, was qualified to state an opinion in answer to the question. Appellant cites *Acord v. General Motors Corp.*, 669 S.W.2d 111 (Tex.1984) and *Southwestern Bell Tel. Co. v. Hardy*, 91 S.W.2d 1075 (Tex.Civ.App.—Beaumont 1936), *rev'd*, 131 Tex. 573, 117 S.W.2d 418 (1938). These cases offer no support for her argument, however. In *Acord*, the trial court's giving an additional instruction that General Motors was not an insurer of the product it designed amounted to a comment on the weight of the evidence. *Acord*, 669 S.W.2d at 116. The *Southwestern Bell* case is completely inapposite because it concerned an improper comment by an attorney upon facts not in evidence. 91 S.W.2d at 1077.

We conclude the trial court did not abuse its discretion in permitting the testimony at issue. Accordingly, we overrule point of error eight-A.

In conclusion, we affirm the judgment of the trial court.