Reversed and Rendered in Part, Reversed and Remanded in Part, and
Opinion filed February 19, 2004









Reversed and Rendered in Part,
Reversed and Remanded in Part, and Opinion filed February 19, 2004.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-02-00086-CV

____________

 

WILSON &
WILSON TAX SERVICES, INC., BILLY R. WILSON, AND JEROME CARTER a/k/a JEROME
CARTER, SR.,
Appellants

 

V.

 

HAYDEN MOHAMMED
AND NAZREEN MOHAMMED, Appellees

 



 

On Appeal from the 113th
District Court

Harris County, Texas

Trial Court Cause No. 98-58694

 



 

O P I N I O N








Billy R. Wilson
and Jerome Carter appeal from an adverse judgment notwithstanding the verdict
and a directed verdict in Hayden and Nazreen Mohammed=s lawsuit against
them.[1]  In four issues, Wilson contends the Mohammeds
failed to prove as a matter of law that they were entitled to judgment notwithstanding
the verdict.  In three issues, Carter
contends the evidence supports the jury=s findings and the
Mohammeds were not entitled to judgment notwithstanding the verdict.  In a fourth issue, Carter contends the trial
court improperly directed a verdict on the promissory note and erred in
refusing to submit requested defensive instructions on that issue.  Because the trial court erred in entering a
judgment notwithstanding the verdict, we reverse and render judgment based on
the jury=s verdict.  Because the trial court erred in directing a
verdict against Carter on the issue of the promissory note, we reverse and
remand for determination of that issue.

I.  Background[2]

Jerome Carter is
an investment banker, a position he held for more than fourteen years.  At the time of the transaction made the basis
of this suit, he was an officer of Trust Investment Group (ATIG@) and handled
financial transactions for the company. 
TIG was a fee-based business facilitator that connected investors with
people or companies needing financing. 
Wilson was a tax accountant, who performed various accounting functions
for TIG, including helping it qualify to do business in Texas and opening a
checking account in its name, on which he was authorized to write checks.

The transaction
involved in the present lawsuit began as an investment in a commodity
transaction to purchase Nike tennis shoes in South America, transport them to
Asia, and sell them Aat a tremendous markup.@  The Mohammeds were investors and TIG was
handling the financing for the purchaser of the tennis shoes, Global
Commodities.








In early 1997,
Nazreen Mohammed=s brother, Samuel Alie, was working with
Eddie Tang.  Tang, who was associated
with a company in Trinidad and Tobago, had been in contact with Carter
regarding financing, through TIG, for a construction project.  Tang asked Carter if TIG needed investors for
any other projects.  Carter responded
that there was a possible commodity deal (the Nike investment) that was
available as a joint venture.  Alie
called Nazreen, told her about the opportunity, and encouraged her to invest.
The Mohammeds invested some of their own money along with money they borrowed
from various friends and relatives.  On
February 28, 1997, the money was deposited in a TIG bank account set up by
Wilson.[3]

A meeting took
place between the Mohammeds, Alie, Tang, Carter, Wilson, the man who owned
Global Commodities (Sajjad Sheekh a.k.a. Jack Perez), and other interested
persons, including Gautum Roy and Shulekha Chandra.  Chandra was Nazreen=s sister, and,
together with Roy, she owned Royko, a company that was created for investment
in the tennis shoe commodity transaction.[4]  At the meeting, the participants agreed to go
forward with the deal.  The plan called
for the group led by the Mohammeds to evenly divide the proceeds with TIG; Alie
was to receive a ten percent commission; and another $150,000 was to go to the
Trinidad and Tobago company associated with Eddie Tang, as a broker=s fee.  Once profits were received they were to be
returned to TIG=s account and disbursed to the
investors.  Roy told Carter to transfer
$160,000 of the investors= funds to Global Commodities to enable it
to purchase the tennis shoes.  Carter
then told Wilson to use the investors= funds in the TIG
account to buy a cashier=s check. 
Wilson did so and gave the check to Carter, who, in turn, gave it to
Global Commodities.  Global Commodities
received the money, but nothing was ever returned to TIG.








When the Mohammeds
inquired about their investment, Carter and Wilson signed an undated document
containing the following handwritten words: APayment Amount:
$200,000 [and] We agree to transmit the above amount.@[5]  The document also included Nazreen Mohammed=s name, address,
bank name, bank account number, and bank address.  No money was ever sent pursuant to this
document.  It was to serve as the basis
of the Mohammeds= breach of contract claims against Wilson
and Carter.  A very similar document,
similarly described as a wire transfer, also appears in the record.  This document was plaintiffs= trial exhibit 5,
and provides instructions to a Mr. Cuellar to wire transfer $200,000 upon completion
of the monetization of the stand-by letter of credit.  The banking coordinates, dollar amount, bank
and bank account number all match the wire transfer document.  The document is dated October 12, 1998, and
bears the signatures of Carter and Nazreen. 
This document will be referred to as the October 12, 1998 wire transfer
to distinguish it from the undated wire transfer document.

In May 1997, the
Mohammeds, along with Roy, arrived at Carter=s home
unannounced.  At this meeting, Carter
signed a promissory note, payable to Nazreen and Royko, for $193,000.  Below Carter=s signature and
his address is the notation Aon behalf of
[TIG].@  The body of the note states AI, We or either of
us promise to pay . . . .@  No
money was ever paid on the note.[6]









The Mohammeds
filed the present lawsuit against TIG, Carter, and Wilson for fraud, breach of
contract, corporate officer liability, and default on a promissory note.  At the charge conference, the court directed
a verdict against Carter and TIG on the promissory note.  At the conclusion of trial, the jury found no
liability against either Carter or Wilson on fraud, breach of contract, or
corporate officer liability.  The jury
found liability only against TIG for $30,000 based on fraud.  The trial court granted the Mohammeds= motion for
judgment notwithstanding the verdict (AJNOV@), and awarded
judgment solely against Carter and Wilson.

II.  JNOV Standard of Review

A judgment
notwithstanding the verdict is reviewed under the same standard as a directed
verdict.  Rush v. Barrios, 56
S.W.3d 88, 94 (Tex. App.CHouston [14th Dist.] 2001, pet.
denied).  In reviewing whether the trial
court=s JNOV was proper,
we must view the evidence in favor of Wilson and Carter and determine whether
that evidence supports the jury=s verdict.  See Exxon Corp. v. Quinn, 726 S.W.2d
17, 19 (Tex. 1987).  ANo evidence@ exists, and a
JNOV should be entered when the record discloses one of the following: (1) a
complete absence of a vital fact; (2) the court is barred by rules of law or
evidence from giving weight to the only evidence offered to prove a vital fact;
(3) the evidence offered to prove a vital fact is no more than a scintilla of
evidence; or (4) the evidence establishes conclusively the opposite of a vital
fact.  See Juliette Fowler Homes, Inc.
v. Welch Assocs., Inc., 793 S.W.2d 660, 666 n.9 (Tex. 1990); Rush,
56 S.W.3d at 94.   When there is more
than a scintilla of competent evidence to support the jury=s finding, the
JNOV should be reversed.  Mancorp, Inc.
v. Culpepper, 802 S.W.2d 226, 228 (Tex. 1990); Rush, 56 S.W.3d at 94B95. 

Although Wilson
and Carter filed separate briefs, two of their issues, fraud and breach of
contract, overlap and will be discussed together.

III.  Fraud








In Wilson=s second issue and
Carter=s first issue,
appellants contend the evidence supports the jury=s finding that
they did not commit fraud and thus the trial court erred if it granted JNOV on
that basis.  In their brief, appellees
concede fraud is irrelevant to appellants= liability to
appellees.  The Mohammeds= position is
supported by the fact that the damages awarded by the trial court, $200,000 in
actual damages plus attorney=s fees, are
damages for breach of contract and not fraud.[7]


If, however, the
trial court based the JNOV on the fraud claim, we find there was more than a
scintilla of evidence to support the jury=s finding Wilson
did not commit fraud.  The charge
essentially tracked the elements of common law fraud: (1) a material
misrepresentation; (2) that was false and was either known to be false when
made or was asserted without knowledge of its truth; (3) that was intended to
be acted upon; (4) that was relied upon; and (5) that caused injury.  Formosa Plastics Corp. USA v. Presidio
Engineers and Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998) (citing Sears,
Roebuck & Co. v. Meadows, 877 S.W.2d 281, 282 (Tex. 1994)).  Appellants contend there was more than a
scintilla of evidence to negate the reliance element of fraud.  Specifically, the Mohammeds both testified
that they relied on representations from Samuel Alie, and not on any
representations by Wilson or Carter, in entering the transaction made the basis
of this lawsuit.  Alie did not
testify.  The Mohammeds= testimony was
sufficient for the jury to determine that the Mohammeds failed to prove the
element of reliance.  See Hendricks v.
Thornton, 973 S.W.2d 348, 360-62 (Tex. App.CBeaumont 1998,
pet. denied) (holding testimony by plaintiffs they relied on third party
representations and not those of defendant negated reliance element).  We conclude there was more than a scintilla
of evidence to support the jury=s findings that
Carter and Wilson did not commit fraud. 
The trial court erred if it based the JNOV on the existence of
fraud.  See Mancorp, Inc., 802
S.W.2d at 228 (holding when there is more than a scintilla of evidence to
support the jury=s findings, a JNOV should be reversed); Rush,
56 S.W.3d at 95.  We sustain Carter=s first issue and
Wilson=s second issue.








IV.  Breach of Contract

In Wilson=s first issue and
Carter=s second issue,
appellants contend the trial court erred in entering a JNOV holding the wire
transfer document to be an enforceable contract and finding that appellants
breached the contract.  See appendix
A (the wire transfer document).  In
answer to question 12, the jury found there was no agreement between Wilson and
the Mohammeds for Wilson to send them $200,000. 
Curiously, while  submission of
the contract issue was identical, except for their names, in regard to both
Carter and Wilson, the jury found an agreement existed between Carter and the
Mohammeds, whereas it found no agreement between Wilson and the Mohammeds.  Regardless, the jury also found that Carter
did not breach the agreement between himself and the Mohammeds.  Despite the jury=s answers, the
trial court entered a JNOV, apparently concluding the evidence conclusively
demonstrated both the existence of an agreement and the breach thereof by
Wilson and Carter. 

1.  Existence of an Agreement 

The wire transfer
document is somewhat of an enigma.  It
bears no date, no date of performance, and is silent as to what consideration
supports Wilson=s promise to pay $200,000 to Nazreen.  During trial, Nazreen was allowed to testify
that the correct date of the wire transfer document was March 11,1997 which,
she testified, was her birthday.  








Whether a contract is ambiguous is a
question of law for the court to decide by looking at the contract as a whole
in light of the circumstances present when the contract was entered.  Coker v. Coker, 650 S.W.2d 391, 394
(Tex. 1983).  A written instrument is
ambiguous when its meaning is uncertain or doubtful.  Id. at 393.  When a contract contains an ambiguity, the
interpretation of the instrument becomes a fact issue.  Id. at 394.  The trial court apparently considered the
wire transfer document to be ambiguous, thus permitting Nazreen=s parol evidence
to clarify the document.  Here, the wire
transfer document explicitly provides that Wilson and Carter Aagree@ to transfer
$200,000 to Nazreen, but without a date on the instrument, it is doubtful and
uncertain as to when that obligation matured. 

Consistent with the
trial court=s implied question of law determination
the wire transfer document was ambiguous, and therefore susceptible to
interpretation with parol evidence, Wilson testified the obligation to send the
$200,000 was contingent on the presence of funds in the account adequate to
satisfy the obligation.  Specifically,
Wilson testified he did not send money to Nazreen because the TIG account never
had funds available for transfer.  He
stated the wire transfer document was merely his instruction from Carter to
send money after it reached the TIG account. 
Wilson emphatically testified he never represented to any person that he
agreed to send personal funds.

During
cross-examination, Nazreen, in response to a question regarding the appropriate
date of performance under the wire transfer document, testified as follows:

Q. 
That document [wire transfer document, plaintiffs= exhibit 8] that says $200,000 does
not say within 30 days, does it?

A. 
No, sir.  That was supposed to be
paid upon receipt or as soon as possible. 
As soon as they funded the letter of credit and they had the money they
were going to send off the $200,000 to us immediately so that we could cover
all the loans that we had taken to fund this letter of credit.  (emphasis added)

The foregoing
testimony by Nazreen is consistent with Wilson=s testimony there
was no agreement to pay the $200,000 until all the funds from the investment
had been returned.  Both Wilson and
Nazreen testified that performance of the duty to pay in accordance with the
wire transfer document was conditioned on the availability of funds in the TIG
account.  The funds could only be
provided by a third party.  








A condition
precedent in the law of contracts may be either a condition that must be
performed before the agreement can become a binding contract, or it may be a
condition that must be fulfilled before the duty to perform an existing contract
arises.  Texas Emp. Ins. Ass=n v. Wilson, 563 S.W.2d 680,
684 (Tex. Civ. App.CWaco 1978, writ ref=d n.r.e.).  Where the parties to a written agreement
agree orally that performance of the agreement is subject to the occurrence of
a stated condition, the agreement is not integrated with respect to the oral
condition.  Restatement second of Contracts ' 217.  Wilson=s promise to pay
$200,000 was not, standing alone, a binding contract.  The condition requiring funds in the account
went to the existence of the contract. 
Upon proof by Nazreen that the money was in the account, the contract
would come into existence.  See Restatement (second) of Contracts ' 224.  

Where more than a
scintilla of evidence supports the jury finding Wilson did not  agree with the Mohammeds to send $200,000,
the finding must be upheld.  Garcia v.
Ins. Co. of Pa., 751 S.W.2d 857, 858 (Tex. 1988).  The testimony of Nazreen and Wilson
constitutes more than a scintilla of evidence the wire transfer document was
subject to a condition that never occurred. 
Such evidence supports the jury finding Wilson did not agree to send
$200,000, and simultaneously vitiates the JNOV. 
Accordingly, we sustain Wilsons= first issue.

2.  Breach of the Agreement








In his second
issue, Carter contends the evidence supports the jury=s finding he did
not breach a contract (the wire transfer document) with the Mohammeds.  The party seeking to recover under a contract
has the burden of proving that all conditions precedent have been
satisfied.  Associated Indem. Corp. v.
CAT Contracting, Inc., 964 S.W.2d 276, 283 (Tex. 1998).[8]  Extrinsic evidence is admissible to establish
an oral condition precedent if it is consistent with the terms of the written
agreement.  Castroville Airport, Inc.
v. City of Castroville, 974 S.W.2d 207, 211 (Tex. App.CSan Antonio 1998, no pet.); Litton v. Hanley, 823 S.W.2d 428, 430-31 (Tex. App.CHouston [1st Dist.] 1992, no
writ).  

The existence of
an oral condition precedent requiring the TIG account to contain money prior to
any transmission of funds out of the account is consistent with the terms of
the wire transfer document.  Further,
there was evidence to support the conclusion the condition precedent to Carter=s promise was
never satisfied.  Accordingly, we find
there is more than a scintilla of evidence supporting the jury=s finding Carter
did not breach an agreement with the Mohammeds to send them $200,000.  We sustain Carter=s second issue.

V.  Wilson=s Issues

A.  Corporate Officer Liability

In his third
issue, Wilson contends the Mohammeds did not prove, as a matter of law, that he
was an officer of TIG on or after the date on which the company lost its
corporate privileges, and thus, he cannot be held liable for the company=s debts.  The Mohammeds pled a cause of action against
Wilson based on officer liability, and the jury charge included a question on
the issue, but the jury found Wilson was not an officer of TIG.  Section 171.255(a) of the Texas Tax Code
states

If the corporate
privileges of a corporation are forfeited for the failure to file a report or
pay a tax or penalty, each director or officer of the corporation is liable for
each debt of the corporation that is created or incurred in this state after
the date on which the report, tax, or penalty is due and before the corporate
privileges are revived.








Tex. Tax Code Ann. ' 171.255(a)
(Vernon 2002).  Evidence at trial
demonstrated TIG became delinquent on November 5, 1997, for failure to pay the
franchise tax.  It lost corporate
privileges on March 3, 1998.  The jury
found that Wilson was not an officer of the company after November 5, 1997.

In their appellate
brief, the Mohammeds, as they did with the fraud issue, expressly deny the JNOV
against Wilson was granted on the officer liability issue, stating instead that
it was granted solely on the breach of contract (wire transfer document) cause
of action.  This position is supported by
the damages awarded by the trial court. 
The only damages expressly found by the jury against TIG, based on
officer liability, were $30,000 based on the jury=s finding of
fraud.  The court, however, awarded
$200,000 against Wilson, which would be consistent with the breach of contract
cause of action.  

Substantively, if
the damages assessed against Wilson in the JNOV were based on officer
liability, we find the record contains evidence supporting either conclusion:
that Wilson was an officer at the relevant time, or was not.  Specifically, the main evidence suggesting
Wilson may have been an officer is a notation on an Application for Certificate
of Authority filed with the Texas Secretary of State=s office.  Below Wilson=s signature on
this document is the term AAuthorized
Officer.@  However, elsewhere in the same document,
where it calls for a listing of [t]he names and addresses of [t]he company=s officers and
directors, Wilson=s name is not listed.  Furthermore, Wilson testified at trial that
the indication he was an officer on the application was in error and that he
was not an officer of TIG at that time and had never been an officer of TIG.  Wilson also presented his own exhibit,
entitled ACorporate Authorization Resolutions.@  Although Wilson signed this document on
behalf of the company, following his name is the notation ANot an Officer.@  Thus, we find that these two documents along
with Wilson=s testimony amount to more than a
scintilla of evidence to support the jury=s determination
that Wilson was not an officer at the relevant time.  Accordingly, we hold the trial court erred if
it based the JNOV on officer liability. 
See Mancorp, Inc., 802 S.W.2d at 228; Rush, 56 S.W.3d at
95.  We sustain Wilson=s third issue.








B.  Attorney=s Fees

In his fourth
issue, Wilson contends the Mohammeds are not entitled to attorney=s fees, but he
is.  He is half right.  The Mohammeds acknowledge in their brief that
if they are not successful on their breach of contract claim they are not
entitled to attorney=s fees. 
A party has to win its breach of contract claim in order to recover
attorney=s fees based on
that issue.  See Green Int=l, Inc. v. Solis, 951 S.W.2d 384,
390 (Tex. 1997) (citing Texas Civil Practice & Remedies Code Section
38.001(8) in holding that to recover attorney=s fees on a
contract action a party must prevail and recover damages).  Because we reverse the JNOV on the breach of
contract issue, we must also reverse the award of attorney=s fees to the
Mohammeds.  We sustain Wilson=s fourth issue to
the extent it challenges the attorney=s fees awarded to
the Mohammeds.

Wilson further
requests under this issue that he be awarded the $7,500 that the jury found was
a reasonable fee for the services of his attorney.  His entire argument consists of the following
unsupported statement: AConversely, Wilson is entitled to recover
the $7,500 in attorney=s fees awarded to him [by the jury]
because he is entitled to the rendition of judgment in his favor.@  Section 38.001 of the Texas Civil Practice and
Remedies Code provides that any person may recover reasonable attorneys= fees in addition to the amount of a
valid claim and costs for suits involving breach of contract. Tex.Civ.Prac. & Rem.Code ' 38.001 (Vernon 1986).  The statute makes no reference to awarding
attorneys= fees to the defendant for the
successful defense of a contractual lawsuit. 
See Ventana Investments v. 909 Corp., 879 F. Supp. 676, 678 (E.D.
Tex. 1995).  Counsel for the parties have
cited no Texas case that permits such fees, and this court has been unable to
locate one.  We overrule Wilson=s issue four to
the extent it seeks recovery of attorney=s fees awarded him
by the jury.

 

 

 








VI.  Carter=s Issues

A.  The Promissory Note

In his fourth
issue, Carter contends the trial court erred in refusing to submit requested
defensive issues regarding the promissory note.  See Appendix B (the promissory note).  In the alternative, Carter argues the trial
court erred in granting a directed verdict on the promissory note.  We will address the challenge to the directed
verdict first because if it is valid, we need not address the challenges to the
trial court=s rulings on the defensive issues.

1.  Directed Verdict

During the charge
conference, after the conclusion of the evidentiary portion of the trial, the
court stated, AWe have no issues as to the promissory
note because I find as a matter of law that [Carter] admitted to signing the
promissory note.@ 
During the hearing on the motion for JNOV, Mr. Hirt, counsel for the
Mohammeds, stated:

I have an inquiry to make with
regard to the promissory note.  I believe
the Court did not present the promissory note issue to the jury because I
believe Your Honor=s words were, Athere is no issue.  He admitted he signed it.@ 
To prepare my judgment, I would ask if it=sCthe Court on its own motion for
directed verdict, which was my perception is how the Court ruled on it, does
the Court find that Mr. Carter and the corporation are both liable on the
promissory note?

Court: I think that=s what I said, isn=t it?

Mr.
Hirt: I believe so Your Honor.  I
just wanted to clarify that before I prepared the judgment with regard to the
promissory note.  

Court:
Okay.

Further, in
response to Carter=s counsel=s comment
regarding the lack of a motion for directed verdict on the promissory note, the
Court stated: AI thought we did it in the charge
conference.  I thought that was my
ruling.  You asked for it to be submitted
and I said no, that I=m ruling as a matter of law that they were
liable on the note.@  It
is undisputed that the trial court ruled as a matter of law Carter and TIG are
liable on the promissory note.








Carter contends,
however, that the trial court erred in holding as a matter of law that he was
individually liable on the promissory note because the facts do not support the
directed verdict.  The Mohammeds respond
with counter-points making the bare assertion 
Carter did not plead failure of consideration for the promissory note.

2.  Standard of Review

A directed verdict
is proper when: (1) a defect in the opponent=s pleading renders
it insufficient to support a judgment; (2) the evidence conclusively proves a
fact that establishes a party=s right to
judgment as a matter of law; or (3) the evidence offered on a cause of action
is insufficient to raise an issue of fact. 
Knoll v. Neblett, 966 S.W.2d 622, 627 (Tex. App.CHouston [14th
Dist.] 1998, pet. denied).  When
reviewing a motion for directed verdict, we consider all the evidence in the
light most favorable to the nonmovant, disregard all evidence and inferences to
the contrary, and give the nonmovant the benefit of all inferences arising from
the evidence.  Mayes v. Stewart,
11 S.W.3d 440, 450 n.4 (Tex. App.CHouston [14th
Dist.] 2000, pet denied).  In this
review, we must determine whether there is evidence of probative value to raise
a fact issue on the material question presented.  Kline v. O=Quinn, 874 S.W.2d 776,
785 (Tex. App.CHouston [14th Dist.] 1994, writ
denied).  If there is any conflicting
evidence of probative value on any theory of recovery, an instructed verdict is
improper and the case must be reversed and remanded for jury determination of
that issue.  Szczepanik v. First
Southern Trust Co., 883 S.W.2d 648, 649 (Tex. 1994).  

3.  Conflicting Evidence

Carter testified
as follows regarding the promissory note:

Q. 
And in regards to this promissory note that you executed while the
Mohammed family was in your home, did you receive any payment in connection
with the execution of that promissory note? 


A. 
No, I did not.








Q. 
Did you receive any other type of money whatsoever to prompt you to
issue that promissory note?

A.  No, I did not.

Q. 
Did you receive any consideration from the Global Commodities Royko deal
to prompt you to issue that promissory note? 


A. 
No, I did not.

Q. 
Did you consider yourself personally responsible to Mrs. Mohammed and
the Royko Group for the return of their investment?

A. 
No, I did not.

**********

Q. 
At the meeting at the Hawthorn Suites, did you personally ever guarantee
anybody=s investment?

A. 
No, I did not.

Q. 
Did you personally represent to anyone at that meeting that they would
get their money back?

A. 
No, I did not.

 

The promissory
note, however, recites on its face AFor Value
Received.@ 
The promissory note was introduced at trial as plaintiffs= exhibit 9.  Thus, at the time the trial court directed a
verdict for the Mohammeds on the promissory note, there was conflicting
evidence on the issue of consideration supporting the promissory note.  

The trial court
erred as a matter of law in directing a verdict against Carter and TIG on the
promissory note because there was conflicting evidence of probative value on
the Mohammeds= theory that Carter was liable on the
promissory note.  A contract in which
there is no consideration moving from one party, or no obligation upon him,
lacks mutuality, is unilateral, and unenforceable.  Texas Farm Bureau Cotton Ass=n v. Stovall, 253 S.W. 1101,
1105 (Tex. 1923).  The conflicting
evidence on this issue vitiates the instructed verdict on the promissory note
and mandates a remand to the jury for determination of the issue of whether the
promissory note can be enforced against Carter and TIG.








The Mohammeds= bare statement of
fact in their brief, replying to Carter=s arguments, that
Carter did not plead failure of consideration is just that: a mere statement of
counsel which lacks any related argument, fails to cite any authority, or
analyze the consequences of such failure. 
The appellate procedure briefing rules require the Mohammeds to provide
us with such discussion of the facts and the authorities relied upon as may be
requisite to maintain the point at issue. 
Franklin v. Enserch, Inc., 961 S.W.2d 704, 711 (Tex. App.CAmarillo 1998, no
pet.).  This is not done by merely
uttering brief conclusory statements unsupported by any legal citation or
argument.  Id.  By failing to comply with Appellate Procedure
Rule 38.1(h), the Mohammeds= counter-point to
Carter=s fourth issue is
waived.  Tex. R. App. P. 38.1(h). 
Moreover, we will not speculate as to the arguments that could have been
brought, or attempt to make those arguments for them.  We sustain Carter=s fourth point of
error.

B.  Corporate Officer Liability

In his third
issue, Carter contends he is not liable for the debts of TIG.  In response, the Mohammeds state Carter is
not being held liable for the debts of TIG, rather he is liable to the
plaintiffs in his individual capacity only based on the promissory note.  We have held the directed verdict holding
Carter and TIG liable on the promissory note was error, and we will remand for
jury determination of the issue of whether the note can be enforced against
Carter individually, and TIG.  Because
the Mohammeds have not brought a cross-point on appeal addressing the issue of
Carter=s liability for
the debts of TIG, which would require the taking of evidence, remand of that
issue is not warranted.  See Tex. R. App. P. 38.2(b)(2)(B).  Accordingly, the remand of the issue of
whether consideration supports the promissory note will be limited to that
issue and the issue of whether Carter is individually liable thereon.

VII.  Conclusion

A.  Wilson








On the issue of
whether Wilson committed fraud, we reverse the judgment to the extent it
imposed liability on Wilson for fraud on the Mohammeds, and render judgment on
the jury verdict.

On the issue of
whether Wilson was legally obligated to send $200,000 to Nazreen, we reverse
the judgment to the extent it imposed liability on Wilson for the wire transfer
document and associated interest, and render judgment on the jury verdict.

On the issue of
Wilson=s liability to the
Mohammeds based on his alleged status as an officer of TIG, we reverse the
judgment to the extent it imposed liability on Wilson and render judgment on
the jury verdict.

On the issue of
attorney=s fees, we reverse
the judgment to the extent it imposed attorney=s fees on Wilson
in favor of the Mohammeds, and overrule Wilson=s request for  attorney=s fees.

B.  Carter

On the issue of
whether Carter committed fraud, we reverse the judgment to the extent it
imposed liability on Carter for fraud on the Mohammeds, and render judgment on
the jury verdict.

On the issue of
whether Carter breached an agreement to send $200,000 to Nazreen, we reverse
the judgment to the extent it imposed liability on Carter for breach of the
wire transfer document, and render judgment on the jury verdict.

On the issue of
Carter=s and TIG=s liability to
Nazreen on the promissory note, we reverse the directed verdict imposing
liability on Carter and TIG and remand for jury determination the issues of
whether the promissory note is supported by adequate consideration, and if so
supported, whether it can be enforced against Carter individually, and TIG. 

C.  Costs








We have reversed
all portions of the judgment as to Wilson and Carter and remanded for jury
determination certain issues regarding the promissory note.  Our judgment is in favor of appellants.  Under Civil Procedure Rule 139, appellants
shall recover the costs of the trial court from appellees.  Tex.
R. Civ. P. 139.  Accordingly, we
reverse that portion of the judgment ordering Wilson and Carter, jointly and
severally, to pay court costs of $1,071.65 to the Mohammeds, and render
judgment Wilson and Carter recover such costs from the Mohammeds, jointly and
severally.

                                                              

 

 

/s/      John S. Anderson

Justice

 

Judgment rendered and Opinion filed
February 19, 2004.

Panel consists of Justices
Anderson, Edelman, and Seymore.











 
 
 
 
 














 
 
 
 
 




 











[1]  Two other
defendants, Wilson & Wilson Tax Services, Inc., and Trust Investment Group,
S.A., were named in the lawsuit.  The
trial court imposed liability on the latter in a directed verdict, but did not
impose any liability on the former. 
Wilson=s opening brief asserts the Mohammeds have waived
liability as to Wilson & Wilson by failing to perfect an appeal as to that
entity, and the Mohammeds= responsive brief does not address the issue.  We conclude Wilson & Wilson is not a
party to this appeal.





[2]  Appellees do
not dispute the basic factual presentation contained in appellants= briefs, nor do they offer their own version.  Accordingly, because they are supported by
record references, we accept appellants=
versions.  See Tex. R. App. P. 38.1(f).





[3]  The Mohammeds
claim they sent a total of approximately $180,000 to TIG.





[4]  Chandra, Roy,
and Royko were apparently brought into the transaction by the Mohammeds.





[5]  This document
is entitled AU.S. Dollar Account,@ and
will be referred to throughout this opinion as the Awire transfer document.@  During trial it was designated Plaintiffs= Exhibit 8.  It
is attached to this opinion as Appendix A.





[6]  The note is attached to this
opinion as Appendix B.





[7]  The Mohammeds
alleged in their petition that they contributed approximately $180,000 to the
transaction not $200,000, but the wire transfer document references the amount
of $200,000.  See Appendix A.  Furthermore, attorney=s fees are recoverable under a breach of contract
action but generally not under a claim 
for common law fraud.  See Tex. Civ. Prac. & Rem. Code Ann. ' 38.001 (Vernon 1997) (permitting recovery of attorney=s fees in contract actions); Cantu v. Butron,
921 S.W.2d 344, 354 (Tex. App.CCorpus Christi 1996, writ denied) (stating that
plaintiffs generally do not recover attorney=s fees
under common law fraud).





[8]  Under Rule 54
of the Texas Rules of Civil Procedure, a party need not prove the performance
or occurrence of conditions precedent when it avers generally in its pleadings
that all conditions precedent have been performed or have occurred, and the
opposing party does not specifically deny that all such conditions have been
performed or occurred.  Tex. R. Civ. P. 54.  In their First Amended Petition, the
Mohammeds stated AAll conditions precedent for and to the receipt of
their consideration have been performed by Plaintiffs@[sic].  This
averment is defective.  First, the
Mohammeds= pleading references a wire transfer dated October 12,
1998, not the undated Exhibit 8, the wire transfer document at issue in this
appeal.  Second, because the condition
precedent alleged at trial by Wilson, the deposit of sufficient funds in the
TIG account, was to be performed by a third party, for whom the plaintiffs
could not speak, and not the plaintiffs, the averment did not cover that
condition.  Consequently, we do not
address the issue as to whether the condition precedent to the wire transfer
document was properly and specifically denied by the defendants.